## BOSTITCH, INC. *et al. vs.* KING FASTENER CO.

APRIL 18, 1958.

PRESENT: Condon, C. J., Roberts, Andrews and Paolino, JJ.

Paolino, J. This is a bill in equity charging the respondent with unfair competition in simulating the containers used by the complainants in the marketing of staples manufactured by the respondent for use in stapling machines which the complainants manufacture and sell. The bill seeks an injunction, money damages and other relief. After a hearing before a justice of the superior court on bill, answer and proof, a decree was entered granting certain prayers of the complainants for relief and denying others. From such decree both parties have appealed, the respondent's appeal being based on the ground that the relief granted was erroneous, and the complainants' appeal on the ground that the trial justice erred in denying the additional relief prayed for.

It appears from the record that complainants manufacture and sell stapling machines and staples, including certain "hump crown staples" which are involved in this case, in about one hundred different sizes and types designated by distinctive code numbers and which were protected by a patent until September 1953. Upon the expiration of such patent respondent and others legitimately began to manufacture and sell similar staples. The complainants do not question the right of respondent to copy the staples themselves after the patent expired.

The issues raised are based entirely upon the methods of *packaging* used by respondent in the sale of the staples for use in stapling machines manufactured and sold by complainants. Such issues relate only to the form and color of the containers used by respondent in marketing the staples in question. More specifically complainants charge respondent with unfair competition in copying complainants' wrappings and cartons with respect to their color, design, style of dress, printing and collocation of features, as well as the use of complainants' code numbers thereon.

It appears from the evidence that prior to 1935 complainants were marketing their staples in light green cartons with two darker green stripes running horizontally across the face and down across the ends—a wider line at the top, a narrower one below—with the Bostitch name and code number on the face. This style and basic design was used until the Second World War when the light green box became unavailable. During that period brownish craft boxes with the same dark green stripes were used. However, in 1948 complainants again began using the light green boxes with the dark green stripes and printing. From 1948 to 1953, 18,772,295 boxes of this type were sold.

The respondent corporation, which was organized in 1947, was engaged in the manufacture of stapling machines and staples. After the hump crown staple patent of complainants had expired in September 1953, respondent and others

began to make and sell the hump crown staples. The respondent marketed its hump crown staples, which were designed for use in Bostitch machines, in packages alleged by complainants to be almost identical with the Bostitch packages and bearing no name of any kind upon such packages or their wrappings. The only designation which appeared on respondent's wrappings was the number of "Cohered Wire Staples" contained therein and the legend "Similar To" after which appeared complainants' code number describing the staples enclosed.

Samples of the packages of both parties to this action were introduced in evidence. The trial justice noted: "It is crystal clear to the Court that the one is a close copy of the other, designed to simulate the other and certain, to the extent appearance can, to lead the average customer to believe that respondent's box is that of the complainant and contains the complainant's product."

Up to this point we have been discussing the industrial stapling machine and staples to fit the same. However, it also appears from the evidence that complainants made and sold small hump crown staples for desk staplers and marketed these in yellow boxes with certain distinctive markings thereon. In 1953 respondent produced identical staples and packaged them in boxes so similar to complainants' with respect to color and design that the trial justice noted "that it clearly was intended to simulate the comparable box of the complainant." However, it appears from the evidence that respondent has discontinued the use of such box and has stated that it has no intention of using the same again. The trial justice further noted that reference to such box was important only as indicating the clear intent of respondent to simulate the box of complainants.

It also appears from the evidence that late in 1953 complainants had begun to use a darker green box with the same horizontal lines; that after receiving a warning letter from complainants in October 1954, respondent began to use a

new box, retaining a light green base, changing the arrangement of lines, but still using the same color combination and the Bostitch code numbers but with no designation as to the source or origin of manufacture. With reference to this the trial justice stated: "The respondent still in fact and by intent is in the opinion of the Court seeking to profit from identifying its staples with those manufactured by the complainant and still remains guilty of unfair competition to an extent deemed by the Court actionable."

The manner in which complainants sell their products is pertinent to the instant issues. They have ten wholly owned subsidiary sales corporations and five independent franchised distributors in the United States as well as wide distribution in over forty foreign countries. They also have over 360 full-time salesmen in the United States who sell directly to consumers and to retail dealers. Sales are made through more than 25,000 outlets consisting of over 11,000 retail stationery stores and over 14,000 industrial dealers including lumberyards and hardware stores. It also appears from the evidence that they have used extensive magazine advertising and counter and window displays as part of their sales methods.

The respondent's manufacture of staples designed for use in Bostitch stapling machines amounts to about 20 per cent of its total business. The respondent does not have exclusive sales distributors of its products. Its distributors carry large inventories of many competing lines of staples. The name "Bostitch" does not appear on any of respondent's packages. However, it does use complainants' code numbers on such packages, following the legend "Similar To" thereon. Such code numbers are used by it for the purpose of notifying prospective purchasers thereof that the staples contained therein are similar to those of complainants which have a like code number and that they are designed for use in stapling machines made by complainants.

In their bill of complaint complainants allege that their

products are greatly superior to other competing products and on that account are preferred and selected by large numbers of the purchasing public; that since before 1940 they have packaged their products in original, distinguishing and distinctive containers which their customers have relied on as a "badge of identification"; that the respondent, intending to deceive the public, packages its staples in containers of identical finish, design, color scheme, style and/or dress, so closely resembling complainants' packaging that customers of complainants are deceived; and that as a consequence of the alleged imitation, complainants' trade, reputation, prestige and good will have been and will be seriously and irreparably impaired and destroyed.

The complainants therefore prayed that respondent be enjoined from the continued use of the offending packaging; that all such packages or cartons in the possession or control of respondent be destroyed; that thereafter it be required to indicate the source of manufacture on all packages containing staples designed for use in machines manufactured by complainants; and that respondent be required to account for and pay to complainants the profits realized by it from the use of such packages, the damages sustained by complainants, and the costs of this suit including counsel fees.

In addition to the many exhibits which are in evidence and the testimony describing the methods used in marketing the staples in question, complainants' witnesses testified in substance to incidents of confusion caused by the simulation of complainants' packages by respondent and of complaints received from customers as a result of the purchase by them of respondent's products when in fact they had intended to buy the staples manufactured by complainants.

On the other hand, respondent denied any intention to deceive or confuse the purchasing public and contradicted complainants' claim that their packages had acquired a secondary meaning. It stated in substance that its methods

of packaging were based on its desire to comply with the wishes of its dealers and to make it easier for them to sell the staples.

The trial justice made the following findings: That respondent's packages were colored and striped to match those of the complainants; that they bore complainants' code numbers after the legend "Similar To" in lighter, less prominent type; and that they contained no identification as to the origin of their manufacture. On the basis of these findings he concluded that confusion on the part of the buyer as to the identity of manufacture was inevitable; that the similarity of the box and the lack of affirmative identification on respondent's boxes were bound to lead only to confusion on the part of the buyer; that the only alternative to the word confusion as the proper description of the result would be the word deception, since the counterfeit was so complete that the average buyer would probably buy without any suspicion that he was not obtaining complainants' staples; and that there was evidence of actual confusion.

In addition to his findings of confusion on the part of the ultimate consumer, uninfluenced by the actions of the dealers and middlemen except as they display their wares on shelves and counters, the trial justice also concluded that the evidence was such that he was bound to find that such dealers would not be averse to leading a customer to believe that respondent's staples originated with complainants. Such conclusion was based on the evidence that respondent's staples sometimes sold at lower prices and on the testimony of dealers produced by respondent that they preferred to sell its products over those of complainants. The trial justice stated that he could not give any great weight to the testimony of those dealers in denying such conduct.

The complainants' witnesses also testified that respondent's staples were in certain respects inferior to those of complainants with resulting jamming when used in complainants' machines, and that in cases where their repairmen

were notified, the difficulty was corrected as soon as their staples were substituted for those of the respondent. The respondent denied that its staples were of inferior quality. However, the trial justice believed the testimony of complainants and concluded that in other instances where they were not notified of such trouble the customer unjustifiably formed a false opinion of the operation and efficiency of their products and that this would be a very serious matter for complainants.

The trial justice, on the foregoing record, arrived at his ultimate findings that complainants' basic green box with two horizontal green stripes through wide use and extensive advertising came to identify its contents as Bostitch staples; that it possessed this meaning even without the name Bostitch being upon it; that compainants' box became a "badge of identity" of their products; and that consequently their boxes had acquired a secondary meaning. In addition he found that respondent's actions in imitating complainants' boxes as to format and color with reference to the staples in question tended to confuse complainants' customers; that such customers were deceived into believing they were purchasing the complainants' staples; that it furnished the means for dealers further to deceive and confuse customers; that it intended to further its own profits by taking advantage of the reputation of complainants and identifying its products with those of complainants as manufacturer; that all this must have been anticipated; that it planned it that way; and that in all this respondent was successful at the cost of complainants.

Based on these findings of fact the trial justice decided as a matter of law that respondent was guilty of unfair competition, and on October 18, 1956 a decree was entered by him permanently enjoining respondent from putting up, offering for sale or selling staples designed to fit or fitting complainants' machine in a package, box or carton: (a) imitating, simulating or deceptively similar to the green

boxes used by complainants since 1952; or (b) using green as a color if more than one quarter of any surface of the same is colored green; or (c) using green as a color without identification of source of manufacture or a trade name adequate to avoid confusion with boxes of complainants; or (d) having thereon the name "Bostitch" without identification of source of manufacture; or (e) having thereon any Bostitch code number without the words "Similar To" or similar distinction appearing thereon in type as prominent as that of the code number and without adequate identification of the source of manufacture.

The final decree also ordered respondent to account and pay to complainants all net profits received by or accrued to it out of the sale of staples in the green or the yellow boxes designed to fit or fitting complainants' machines. The respondent was also ordered to deliver to complainants for destruction all green cartons, packages or boxes in its possession or under its control designed for packaging staples for complainants' machines and it was ordered to pay the costs of this proceeding. The trial justice denied complainants' prayers for punitive or exemplary damages, damages for loss or injury to their good will, and damages for loss of their own profits.

The first point raised by respondent under its reasons of appeal is that the trial justice was clearly in error in his findings of fact that complainants' box through long usage had acquired a secondary meaning; that respondent had deceived and confused complainants' customers; that it had intentionally furnished its dealers with the means to deceive customers to further its own profits; and that consequently the trial justice erred in concluding that respondent was guilty of unfair competition.

The respondent concedes that complainants have "for a long time marketed a product with widespread reputation which is of great commercial value," but it contends that they have failed to prove that such product was marketed

in containers of unique dress for such length of time as to have become a "Badge of Identity" to the consuming public or that the public usually selects complainants' product by such identification as a matter of preference. In other words respondent argues that for complainants to prevail they must prove that a secondary meaning has attached to the packages involved and that, having failed to prove the existence of the basic elements of secondary meaning, they cannot prevail.

It is well-settled law that, when a patent covering an article of manufacture has expired, the original manufacturer cannot prevent another from making and marketing an exact copy of the article, so long as the other does not deceive the public by passing off his product as that of the original manufacturer. The identical imitation of the goods of another does not in itself constitute unfair competition. The public interest in free competition generally outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to customers. *Tas-T-Nut Co.* v. *Variety Nut & Date Co.*, 245 F.2d 3; *West Point Mfg. Co.* v. *Detroit Stamping Co.*, 222 F.2d 581; *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169.

The instant case, however, does not involve an article of manufacture, but rather the *package* in which the article is marketed. The difference in the protection against imitation which will be accorded to an article of commerce on the one hand and to a package in which the article is marketed on the other was long ago noted. *Tas-T-Nut Co.* v. *Variety Nut & Date Co., supra,* at page 6; *Flagg Mfg. Co.* v. *Holway,* 178 Mass. 83. In the latter cases it was pointed out that the public policy which permits the imitation of an article of commerce does not apply to the dress in which the article is marketed. See also *Pagliero* v. *Wallace China Co.,* 198 F.2d 339, and *Kellogg Co.* v. *National Biscuit Co.,* 305 U. S. 111.

It is well established that the first user is entitled to

relief from an imitation if such user's trade dress has acquired a secondary meaning, and that when the unfair competition complained of is the marketing of a product in containers or with labels which have acquired a secondary meaning the competitor cannot avoid liability merely by affixing his own name. See *Tas-T-Nut Co.* v. *Variety Nut & Date Co., supra,* at page 7, and cases cited therein.

Assuming without deciding that the existence of a secondary meaning is required in "packaging" cases as distinguished from "article" cases in order to prove unfair competition, it is our opinion that the evidence in the instant case supported the finding by the trial justice that the complainants' boxes had acquired a secondary meaning in that they had "become associated in the mind of the public as identifying the source or origin of goods, rather than the goods themselves" or in that they had "acquired generally in the market a special significance identifying" the complainants' goods. 150 A.L.R. 1067, 1071-1073; 3 Restatement, Torts, §741 (b). *Tas-T-Nut Co.* v. *Variety Nut & Date Co., supra.*

It is as clear to us as it was to the trial justice that the format and design of the complainants' packages, namely, the combination of colors and design and the collocation of features, were distinctive. We are likewise convinced that the evidence relating to the large volume of sales, to the extensive advertising conducted by complainants, to the superior quality of complainants' staples designed to fit their own machines and the widespread reputation of their staples which respondent concedes was of great commercial value justified the trial justice's finding that a secondary meaning had attached to complainants' boxes. See 150 A.L.R. 1090, 1091, and cases cited therein. The fact that complainants' staples had been protected by a patent before 1953 and that the large volume of sales resulted from such protection does not detract from the acquisition of a secondary meaning by the boxes. 150 A.L.R. 1115. It is reasonable

to infer from those sales that the purchasing public would acquire a preference for the hump crown staples which it had purchased in such large volumes and over a long period of time in the distinctive package of the complainants. The staples involved in the instant case are hump crown staples to fit complainants' machines. From the evidence that complainants had manufactured and sold such machines and staples for a long period of time, it is equally reasonable to infer that the purchasing public came to think of the staples in the green box designed for use in complainants' machines as being produced by the manufacturer who made the machines for which the staples were purchased.

In view of our conclusion that the trial justice did not err in finding that a secondary meaning had attached to complainants' packages, we do not deem it necessary to determine whether the existence of a secondary meaning in so-called "packaging" cases is necessary to prove unfair competition. However, we wish to point out that there is a difference between "article" cases and "packaging" cases and that the public policy which affords protection in the former does not apply in the latter type of cases. For a discussion of these questions see *Tas-T-Nut Co.* v. *Variety Nut & Date Co., supra,* at page 6; *American Chicle Co.* v. *Topps Chewing Gum, Inc.,* 208 F.2d 560; *My-T Fine Corp.* v. *Samuels,* 69 F.2d 76.

After carefully reading the record it is our opinion that the evidence supports the findings of the trial justice that the respondent had deceived and confused complainants' customers, and that it had intentionally furnished its dealers with the means to deceive such customers to further its own profits. There is no merit in respondent's contention that it had no intention to confuse or deceive its customers or to palm off its products as those of the complainants. The result speaks for itself. See *Yellow Cab Co.* v. *Anastasi,* 46 R. I. 49. The trial justice's findings that respondent deliberately simulated the packages of complainants and

that such simulation is responsible for the resulting confusion and harm to complainants is clearly supported by the evidence. See 2 Nims, Unfair Competition and Trade-Marks (4th ed.) §377, p. 1208. We are further of the opinion that the evidence supports his finding that respondent's dealers would not be averse to leading customers to believe that its products were the products of the complainants. We agree with the trial justice that "The test is whether the manufacturer put into circulation directly or indirectly goods likely to cause the confusion, either by themselves or combined with the actions of dealers which may be anticipated and even by implication encouraged." See 2 Nims, Unfair Competition and Trade-Marks (4th ed.) §381, p. 1214, and cases cited.

The respondent's contention that it simulated complainants' boxes to please its dealers and to aid respondent in selling its products does not excuse or justify its actions. See *My-T Fine Corp.* v. *Samuels, supra,* at page 77, where the court stated: "* * * a late comer who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile. Prima facie the court will treat his opinion so disclosed as expert and will not assume that it was erroneous." See also *American Chicle Co.* v. *Topps Chewing Gum, Inc., supra,* at page 563, and *Chesebrough Mfg. Co.* v. *Old Gold Chemical Co.,* 70 F.2d 383, where the court said at page 385: "We cannot escape the conclusion that it acted, in coloring and designing its label as well as in marking its carton, with the fraudulent intent to simulate the dress and markings of appellant's products." In those cases the second user copied the first user's packages, but unlike the instant case, the imitators placed their own name or trade-mark on their packages.

In *Yellow Cab Co.* v. *Anastasi,* 46 R. I. 49, 52, this court stated:

"It is of no avail for respondent to affirm his intention to avoid any simulation of complainant's distinc-

tive color scheme. The result speaks for itself and his intention is properly held to be the natural and probable result of his considered action. One fair test of the fairness or unfairness of respondent's competition is this—Would respondent, if he wished to build up a personal business and acquire an individual patronage, so paint his cabs that at a short distance they were indistinguishable from those of his competitor? We think he would not. What he intended was to secure a certain benefit and patronage which he hoped to divert from the Yellow Cab Co., not as a result of legitimate competition, but by reason of the failure of the travelling public to easily distinguish his cab from those of complainant. This is unfair competition against which complainant is entitled to be protected."

In that case the court was not concerned with the question of secondary meaning attaching to the complainant's color scheme. It there found that the complainant had used a distinctive color scheme; that the respondent had copied the same although he used his own name on the cab; and that the resulting confusion constituted unfair competition.

It is generally held that actual confusion need not be proved if the respondent has made a package enough like that of the complainant so that confusion is probable, and that the respondent's intent to create confusion and his success in confusing the complainant's customers can be inferred from the respondent's action in so copying the complainant's package. See *Merlino* v. *Schmetz*, 66 R. I. 425, where the court stated at page 428: "The test of unfair competition seems to be whether the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." The real test is not whether the evidence shows actual confusion, but whether confusion and deceptions are likely to occur as a result of the actions of the second user simulating the format and design of the packages of the first user, including,

in the instant case, the use of complainants' code numbers with no other indication of the source of manufacture. See *Sasser* v. *Senco Products, Inc.,* 242 F.2d 565.

It is also well settled that one who places in the hands of his dealers or distributors a package readily susceptible to palming off, or to customer confusion or deception, is chargeable with unfair competition. *Mershon Co.* v. *Pachmayr,* 220 F.2d 879. See also 2 Nims, Unfair Competition and Trade-Marks (4th ed.) §381, p. 1214, and cases cited.

The evidence in the instant case supports the findings of fact made by the trial justice, and we cannot say that such findings were clearly wrong or that they fail to do justice between the parties. It is our opinion that he applied the correct law and that he did not err in finding respondent guilty of unfair competition.

The complainants, while conceding that the trial justice did not err in his findings of fact and the relief granted as far as he went, base their appeal on the contention that he erred in failing to award complainants damages for injury to reputation and good will, the legal expenses which respondent's unfair competition required complainants to incur, and exemplary or punitive damages.

It is well established in cases involving unfair competition that the remedies available to an injured party include injunction against further use of the offending article or package, the award of *actual* damages to the injured party including special *proved* losses and loss of profits, the imposition of punitive damages, the ordering of an accounting to the injured party by the offending party for all profits arising out of the imitation, and the destruction of the simulated objects still in the offending party's possession or control. 3 Restatement, Torts, §§744-747; 2 Nims, Unfair Competition and Trade-Marks (4th ed.) §373d, p. 1180.

In the instant case the trial justice stated that complainants had not asked for an award of their loss of profits and observed that it seemed probable that they could not estab-

lish a realistic figure for such in the circumstances of the instant case. He further stated that the imposition of such an award might involve duplication with the payment to them of respondent's profits from the unlawful operations. He further found that they had not proved actual damage by way of expenses or any figure representing damage to good will, and that he was not convinced that punitive or exemplary damages should be awarded in addition to the other remedies ordered by him in the instant case.

After carefully reading the record it is our opinion that the trial justice's findings are supported by the evidence and that there is no merit to complainants' contentions that he erred in denying them the additional relief prayed for, namely, alleged profits lost by complainants, punitive damages, legal fees and damages for loss of good will.

We shall next consider respondent's contention that the trial justice erred in ordering respondent to account for and pay to the complainants all the net profits received or accrued to it out of the sale of staples designed for complainants' machines either in the green or yellow boxes. We deem it pertinent to point out that the instant case does not involve the infringement of a registered trade name, trade-mark, patent, copyright or any statutory remedy. The issues presented are based solely on unfair competition.

The respondent's instant contention is based on its claim that, notwithstanding the finding of unfair competition on its part, the trial justice erred in ordering such accounting in the absence of an express finding of fraud. It argues that the trial justice did not make such finding of fraud, and to support its contention respondent relies on the following portion of his rescript wherein he stated: "Furthermore it is apparent that, conceding that respondent may not have intentionally done anything it believed to be wrong, it has deliberately taken the action summarized above, which in fact has caused confusion and harmed the complainant."

After carefully reading this statement in context with

the entire rescript we cannot say that the trial justice made an express finding of fraud on the part of respondent. The charge of fraud is a serious matter. The courts have always jealously guarded the rights of litigants in cases where fraud has been charged. They have required a high degree of proof in establishing fraudulent intent because of the serious consequences which result when a charge of that kind has been properly proved. In the absence of an express finding of fraud, and in view of the trial justice's aforesaid statement, we believe it would be unreasonable for us to infer such a finding.

Therefore, the question remains whether in the absence of such finding the trial justice erred in ordering the instant accounting. There is a split of authority on this issue. In *Radio Shack Corp.* v. *Radio Shack, Inc.*, 180 F.2d 200, 207, in considering the question of an accounting the court stated: "It does not follow as a matter of course that in addition to an injunction a winning plaintiff in every case of unfair competition is entitled to a monetary award in the form of damages or an accounting of profits. * * * The character of the conduct giving rise to the unfair competition is relevant to the remedy which should be awarded." See also *Consumers Petroleum Co.* v. *Consumers Co. of Illinois*, 169 F.2d 153, where the court said at page 164: "And the fact that we have concluded that its conduct was wrongful neither impairs nor dispels the idea that it acted in good faith. Under the circumstances, we are of the view and so hold that the rights of the plaintiff will be sufficiently protected by an injunction and that the equities of the situation are such that a monetary award should be denied." In 4 Callmann, Unfair Competition and Trade-Marks (2d ed.) §89.2(a), p. 1868, the rule is stated as follows: "Damages are not recoverable nor, according to the weight of authority, is the right to an accounting of profits available in an action for unfair competition except upon proof of the defendant's wrongful intent." See also *Straus* v. *Nota-*

*seme Hosiery Co.*, 240 U. S. 179, 181, where Mr. Justice Holmes made the following statement:

> "The liability of the defendant must be derived from unfair competition if it exists. That it was unfair to continue the use of a label so similar in general character to the plaintiff's we are not disposed to deny. But it does not follow that the defendants are chargeable with profits as a matter of course. Very possibly the statutory rule for wrongful use of a trade-mark may be extended by analogy to unfair competition in a proper case. But as the ground of recovery in the latter instance is that the defendant has taken some undue advantage of the plaintiff's reputation or that of his goods, and as the nature and extent of the wrong may vary indefinitely, it cannot be assumed in all cases that the defendant's sales were due to that alone."

Notwithstanding the language in *Alexander Bros.* v. *Morse,* 14 R. I. 153, 161, it is our opinion that in a case such as this where there is a finding of unfair competition, no accounting of profits should be ordered in the absence of an express finding of fraud on the part of the respondent. For these reasons it is our opinion that the trial justice erred in ordering the respondent to account and pay to the complainants all net profits received by or accrued to it out of the sales of staples designed to fit or fitting complainants' machines either in the green or yellow boxes. See *Ronson Art Metal Works, Inc.* v. *Gibson Lighter Mfg. Co.*, 3 App. Div. 2d (N.Y.) 227, 159 N.Y.S. 2d 606. See also *Champion Spark Plug Co.* v. *Sanders,* 331 U. S. 125, an unfair competition case where the United States Supreme Court refused to order an accounting in the absence of fraudulent intent on the respondent's part.

The complainants' appeal is denied and dismissed. The respondent's appeal is sustained in part and denied in part. The decree appealed from is reversed in part, otherwise it is affirmed, and on April 25, 1958 the parties may present to this court for approval a form of decree, in accordance with this opinion, for entry in the superior court.

## ON MOTION FOR REARGUMENT.

MAY 2, 1958.

PER CURIAM. After our decision in the above case the complainants asked and received permission to file a motion for reargument for the purpose of requesting that the case be remanded for further proceedings by the trial justice to determine whether the respondent in its conduct had a fraudulent intent.

In our opinion filed April 18, 1958, the parties were ordered to present to this court a form of decree, in accordance with the opinion, for entry in the superior court. However, in view of complainants' request for reargument, the hearing on entry of such decree was continued until we could consider the reasons on which they based their motion for leave to reargue.

Upon careful consideration we are of the opinion that complainants' request must be denied, since it is not based on any matter which was not fully considered and passed upon directly or indirectly by us in reaching our decision.

The complainants' motion is denied, and on May 7, 1958 the parties may present to this court for approval a form of decree, in accordance with the original opinion, for entry in the superior court.

*Tillinghast, Collins & Tanner, Benjamin A. Smith, Edwin H. Hastings,* for complainants.

*Milton G. Johnson, Melvin L. Zurier,* for respondent.