ELECTRONICS CORPORATION OF AMERICA, Plaintiff, Appellant,

v.

HONEYWELL, INC., Defendant, Appellee.

No. 7493.

United States Court of Appeals, First Circuit.

Heard April 7, 1970.

Decided June 2, 1970.

Daniel F. Featherston, Jr., Boston, Mass., for plaintiff-appellant.

Norman A. Hubley, Boston, Mass., Alex J. McFarland and Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., on brief, for defendant-appellee.

Before ALDRICH, Chief Judge, COFFIN, Circuit Judge, and FORD, District Judge.

ALDRICH, Chief Judge.

This is a diversity action for unfair competition in which plaintiff appeals from the denial of a temporary injunction following the submission of affidavits by both sides. 303 F.Supp. 1220. We do not reach a further count under the Lanham Act, 15 U.S.C. § 1125, possibly of questionable merit. *Cf.* Samson Crane Co. v. Union Nat. Sales, Inc., D. Mass., 1949, 87 F.Supp. 218, aff'd, 1 Cir., 180 F.2d 896. Plaintiff, Electronics Corporation of America, is a company of national stature engaged in the manufacture of various safety control systems. The one here involved performs the function of monitoring, supervising and managing large capacity oil, gas, and coal burners in utility, industrial and commercial heat and power plants. Defendant Honeywell, Inc., is a substantially larger concern, with a wider variety of products, which competes with plaintiff in the field of safety controls. Apparently here, over the years, plaintiff has had substantially greater success.

Plaintiff's so-called Fireye control consists of an electronic programmer, a terminal strip, a control house, a sensor and a sensor housing. Its principal component is the programmer, but the customer's installation expense relates to the rest of the system. Once this has been completed, plaintiff's programmer is installed simply by pushing it into the control house, hereinafter box, which has receptacles designed to receive it, and tightening two set screws. It is removed with like facility. Programmers wear out and need to be replaced. In addition, in February 1969 plaintiff declared its old Model 1008 programmer "obsolete." Its new Model 6008 was designed to be inserted in the same manner in the old box.

Because of the facility of exchange, it is much easier to replace a programmer than it is to install a whole new system. It is, correspondingly, easier, since because of plaintiff's past success most of the extant control systems are plaintiff's, for plaintiff to sell its repacement than it is for defendant to compete. To meet this, defendant reconstructed its own programmer so that it could be installed in plaintiff's box and thus permit defendant to compete in the replacement field. For reasons not gone into below, defendant's Model R4150H was not designed to fit into plaintiff's box with a single push. Defendant supplied a metal harness, or subbase, to make it compatible.

In order to install defendant's programmer in plaintiff's box, holes are bored in the base and defendant's subbase is mounted thereon. Some fifteen emanating wires, terminating in banana plugs, are then inserted manually into the original base receptacles designed to receive automatically the prongs extending from plaintiff's device. Although these plug-in connectors are numbered to correspond with numbers on the plaintiff's box, this installation is not a simple operation. Among other things, defendant's instructions (not part of its advertising brochure hereinafter referred to) stated in capital letters the necessity, in installing the defendant's harness, of using "extreme caution not to damage any wiring that may be behind the cabinet." An uncontradicted affidavit from the plaintiff points out that a mistake in putting a plug in the wrong hole could cause an explosion.

When defendant had completed its Model R4150H it released a single sheet, fold-over, advertising brochure. The cover announced, "NOW YOU CAN RE-PLACE OBSOLETE * FIREYE * WHEELCO * McGRAW EDISON * HONEYWELL Programmers in less than an hour with this new Programmer that plugs right into the old subbase. See inside for other special features." Wheelco and McGraw Edison were other competitors, but concededly of small consequence in this area. Inside, the brochure referred only to replacement of Honeywell and Fireye programmers, and had a large cut illustrating defendant's programmer being installed in one of plaintiff's boxes. The brochure was addressed to the retail trade, as is apparent not only from its wording, but by the form of the detachable coupon which could be used to request further information.[1] And, obviously, the retail trade is not everyone in the market for control systems, but solely those who already have a system and need to replace the programmer component.

Plaintiff complains of this brochure. It also complains of the entire substance of defendant's activities.[2] While, strictly, the latter aspect may not be before us, we must consider it, tentatively, to the extent that it bears upon the nature of plaintiff's present attack upon the brochure. Although, in a sense, defendant's programmer is a cuckoo in plaintiff's nest, there has been no deceit as to its parentage. Defendant's programmer is not only advertised, but conspicuously and permanently marked with its name, a name too well known to be thought a subsidiary trade name of the plaintiff's. When it is purchased for installation in plaintiff's box, there is no palming off. Once in the box, it becomes affixed to the customer's building and is not likely to be resold to some further customer. There are, conceivably, a few situations in which an owner

---

1. It also seems apparent from the number printed. While the number of the original brochure does not appear, when defendant printed a substitute, see *post*, it ordered 10,000 copies.

2. The district court put it,
   "As to the merits, plaintiff contends that the defendants [sic] in effect should not be permitted to produce and sell a product such as its Model R4150H replacement control. The essence of this complaint is that the defendants are appropriating to their own use the outer box and other associated parts of the Fireye system, and that such conduct represents unfair competition."

could subsequently be mistaken, or might blame plaintiff if defendant's programmer failed to operate, but some slight danger of confusion accompanies any competition in the sale of replacement parts. It would be difficult to take seriously a claim that defendant is precluded from openly selling replacements to be used in, or as part of, plaintiff's total unit, at least in the absence of very special circumstances not here suggested. Myles Standish Mfg. Co. v. Champion Spark Plug Co., 8 Cir., 1922, 282 F. 961, 967; 2 Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 62.2(b) (3 ed. 1968).

At the same time, sight must not be lost of the fact that defendant is not competing in a general market. Not only is plaintiff's Fireye Model 6008, as the court put it, the "chief target of the advertising campaign," but, so far as owners of plaintiff's system are concerned, their sole alternatives are plaintiff's replacement or defendant's. In these circumstances we do not consider applicable the "traditional" doctrine that competitors' actions for false advertising are limited to instances of trademark infringement, passing off, and product disparagement. See Developments in the Law—Deceptive Advertising, 80 Harv. L.Rev. 1005, 1017–18 (1967); 1 Callman, ante, § 18(1) at 599–600; American Washboard Co. v. Saginaw Mfg. Co., 6 Cir., 1900, 103 F. 281, 43 C.C.A. 233; Chamberlain v. Columbia Pictures Corp., 9 Cir., 1951, 186 F.2d 923. We agree with the reasoning of L. Hand, J., speaking for the court in Ely-Norris Safe Co. v. Mosler Safe Co., 2 Cir., 1925, 7 F.2d 603, 604, rev'd on other gr'ds, 1927, 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578.

"The reason, as we think, why such deceits have not been regarded as actionable by a competitor, depends only upon his inability to show any injury for which there is a known remedy.

In an open market it is generally impossible to prove that a customer, whom the defendant has secured by falsely describing his goods, would have bought of the plaintiff, if the defendant had been truthful. Without that, the plaintiff, though aggrieved in company with other honest traders, cannot show any ascertainable loss. He may not recover at law, and the equitable remedy is concurrent. The law does not allow him to sue as a vicarious avenger of the defendant's customers."

Smith-Victor Corp. v. Sylvania Electric Products, Inc., N.D.Ill., 1965, 242 F.Supp. 302, 309, makes a similar point. The court interpreted American Washboard Co. v. Saginaw Mfg. Co. ante, and Ely-Norris to mean that a competitor does not have "standing" to sue for false advertising unless there has been passing off, or the plaintiff "has a complete monopoly of the goods involved," since "it is generally impossible for the plaintiff to prove that a customer * * * would have bought the goods of the plaintiff if the advertisements of the defendant had been truthful. * * *"

■ Owners of worn-out Fireye programmers have nowhere to turn except to the plaintiff or the defendant. Material misrepresentations in defendant's advertising will damage the plaintiff, whether or not there is passing off or express disparagement.[3] We hold them actionable.

The initial possible misrepresentation is on the outside of the brochure, that defendant's "new Programmer * * * plugs right into the old subbase." Since, after defendant's wiring subbase has been affixed, the banana plugs at the end of the 15 terminal wires can be manually "plugged in," this description may be literally accurate, but it is not at all accurate in the sense in which it would be read, viz., as a comparison with its

---

3. In *Ely-Norris* the defendant claimed that its product had a feature which in fact, the court found, was possessed only by plaintiff's. Accordingly, some authorities would restrict the action to instances where a defendant falsely represents that its goods have qualities possessed by the plaintiff's. *E. g.*, Restatement, Torts, § 761 (1939). We take a broader view. In a two-firm market, harm is sufficiently apparent whenever material misrepresentations are made.

"target," plaintiff's Model 6008. In view of the fact, however, that defendant revealed that its installation took "less than an hour," implying that something more than a simple plug-in was required, it may be doubted whether plaintiff has any action for this statement. At the same time, it clearly shows that defendant had set out to be less than candid.

The inside of the brochure carried this matter further. The "plug-in" was "an easy job. * * * No electrician required." Any suggestion that the plug-in is a shoe-in, to be accomplished by the customer's own personnel, was misleading. Defendant admits that its installation requires specially trained burner servicemen. Apparently the distinction is that these are not, strictly, electricians.

> Continuing, defendant announced,
>
> "Small and relatively inexpensive, yet gives full programming, low fire prepurge and release to modulation, purge and sequencing, trial for pilot ignition and main flame, and many other features found only on much more expensive controllers."

If these statements had been made in order to compare defendant's product with the general field of programmers, possibly they could all be justified. Read against their "target," their validity is substantially different. Plaintiff quite properly complains of the phrase "relatively inexpensive." In fact, defendant's programmer is slightly more expensive. Any "modesty" (*see* n. 4, *post*) of this language is dispelled by the final crescendo reference to "much more ex-

pensive programmers." In the light of the purpose of the brochure to replace Fireye and other specified programmers, the court's conclusion that there was no misstatement because the remarks were not directed to plaintiff's programmer is unrealistic and impermissible.[4] This was a serious misrepresentation.[5]

■ Although the court excused the price comparison as not directed to plaintiff's programmer, it found that the statement "No electrician required for replacement of old programmers" was "misleading and irresponsible." Nonetheless, it denied preliminary relief even for this on the ground that a competitor had no action against false advertising which contained neither product defamation nor the "degree of deception" present in the *Ely-Norris* case, *ante*. This principle we have held inapplicable. In this court defendant advances a further ground, that after (in our view, much too long after) the litigation commenced it withdrew the original brochure and issued a new one, which substituted for "No electrician required," "Minimal electrical changes required."[6] Defendant contends that no order is needed where it has already made a correction. We might accept the principle that so far as a preliminary injunction is concerned, as distinguished from a permanent injunction, *see* United States v. W. T. Grant Co., 1953, 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303. Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1076 (1965), voluntary reform will always suffice. However, such a principle does not go far enough. Defendant

---

4. The district court found,

> "Although the R4150H replacement is more expensive than the ECA 6008, the chief target of the advertising campaign, it is less expensive than the replacement of one 'system' by another. The modest language, '*relatively* inexpensive', is not misleading when interpreted in this way." (Emphasis in original)

There was no reason why the brochure should be "interpreted in this way." Defendant's programmer was not being offered to persons who were comtemplating the replacement of an entire system.

5. We add, for future purposes, that it is questionable, if not outright misrepresentation, in stating, in the frame of reference of advertising a product as a substitute for another, identified, product, that the offered product has "special features" when whatever is so described is in no way different. So far as appears, many, if not most, of defendant's vaunted "special features" were nothing new to owners of plaintiff's programmers.

6. It also corrected another matter, regarding underwriters' labels shown in the cut of plaintiff's box mentioned earlier, which we need not now go into.

turned a deaf ear to plaintiff's complaint of the improper price comparison. Here the substitute brochure made no change. The court's finding that "plaintiff has not demonstrated that it will be harmed irreparably by a denial of a preliminary injunction or that it is likely to prevail on the merits" cannot be supported.[7]

The case must be remanded with directions to enter a preliminary injunction against the further use of defendant's original and substitute brochures; with mandate to issue in ten days. We see no reason for the court to require a bond of any substantial size, and surely not the huge figure suggested by defendant measured in terms of damage to its "reputation." We leave to the district court what further interlocutory relief it may order by way of recapture of brochures in the hands of defendant's agents or representatives, and what new brochure should be permitted, if the defendant seeks a ruling on this subject. We do note, however, that defendant made little effort, at least so far as color and format were concerned, to make its first substitute readily distinguishable from the original.

---

7. We note defendant's statement in oral argument that plaintiff should be able sufficiently to prove its damages if the injunction was wrongfully denied, but it may be that defendant's subsequent cooperation in this regard will prove to be less than total.