In the Matter of EMERGENCY BEA-CON CORPORATION, Debtor.

Bankruptcy Nos. 76 B 356, 77 B 980.

United States Bankruptcy Court, S. D. New York.

Aug. 27, 1981.

Harvey S. Barr, Spring Valley, N. Y., trustee in Possession and Atty. for trustee in Possession.

Robert L. Brinton, White Plains, N. Y., for Artex Aircraft Supplies, Inc.

Stephen G. Glatzer, pro se.

## DECISION ON COMPLAINT OF DEBTOR SEEKING A PERMANENT INJUNCTION

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor in this Chapter XI case under the former Bankruptcy Act [1] commenced an adversary proceeding seeking a permanent injunction and damages against Artex Aircraft Supplies Inc. with respect to the advertising and merchandising of Artex batteries as compatible for replacement use in

---

1. Although the Bankruptcy Act of 1898, as amended, was repealed by § 401(a) of Title IV of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, 2682, effective October 1, 1979, § 402(a), the repealed Act remains in full force and effect as to pending bankruptcy cases filed prior to October 1, 1979. See, § 403(a).

the debtor's emergency locator transmitter models, known as Emergency Beacons. The beacons are used in airplanes as a safety device designed to radiate a signal triggered by an impact for purposes of locating a downed airplane.

In conjunction with its adversary proceeding, the debtor has requested that an order for a preliminary injunction be issued restraining Artex from advertising, displaying, merchandising or selling any battery packs using the name Emergency Beacon Corporation or the designation GS–21 or GS–51 or inferring that the Artex battery pack is an Emergency Beacon Product and is compatible for replacement use in the debtor's Emergency Locator Transmitter (ELT) models, known as Emergency Beacons.

The debtor's original application for a preliminary injunction was dismissed by this court without prejudice on August 7, 1981, because the debtor had not yet commenced an adversary proceeding with respect to which the requested preliminary relief could relate. The parties have agreed that the transcript in the original hearing, the exhibits and the Artex answer in opposition to the relief requested should be part of this record and supplemental to the evidence submitted in connection with the debtor's further request for a preliminary injunction.

The debtor maintains that its Emergency Locator Transmitter model known as an Emergency Beacon is a valuable patented property right of the estate which will be impaired and harmed to the detriment of the debtor and the estate if this court does not intercede to protect such property from harm allegedly caused by the conduct of Artex as set forth in the debtor's complaint.

Artex filed an answer to the debtor's original request which generally denies the merits of the debtor's allegations and alleges that it has met all quality control standards of the Federal Aviation Administration (FAA) and that its Alkaline Battery Pack has been approved for use in the emergency locator transmitter manufactured by the debtor. Hence, Artex main-

tains that the requested relief would have the effect of decertifying that which the FAA has authorized and certified and is inconsistent with the delegation of authority to the FAA to certify or decertify certain products relating to aviation.

This court's undisputed jurisdictional predicate is Section 311 of the Bankruptcy Act, which gives the court in which a Chapter XI petition is filed exclusive jurisdiction of the debtor and its property, wherever located. Such property includes intangible rights such as good will. In *Mutual Life Insurance Co. v. Menin*, 115 F.2d 975 (2d Cir. 1940) cert. denied 313 U.S. 578, 61 S.Ct. 1096, 85 L.Ed. 1536 (1941), Judge Learned Hand said: (p. 977)

> "Obviously so understood, 'good-will' is dependent . . . upon the privilege of using the old name and of preventing its use by others . . .".

In this case, Artex reasons that it is entitled to advertise that its battery packs are suitable replacement batteries "For All ELTs Manufactured by Emergency Beacon Corp." [Exhibit # 4; 8/4/81] because the Department of Transportation of the Federal Aviation Administration issued a Technical Standard Order [TSO] authorizing Artex "to identify the Artex Alkaline Battery Pack, P/N 00–21–006, for use in the Emergency Beacon Corporation ELT Models." [Exhibit # A; 8/4/81]

## FINDINGS OF FACT

1. The debtor, Emergency Beacon Corporation, located in New Rochelle, New York, has produced and sold during the past thirteen years Emergency Locator Transmitters [ELTs], and other avionic equipment in this country and abroad. It also purchases battery packets manufactured by a related company for use in the Emergency Beacons in accordance with prescribed standards and specifications.

2. The defendant, Artex Aircraft Supplies, Inc., located in Canby, Oregon manufactures various items for avionic equipment, including a battery packet for use in ELTs.

3. The debtor manufactures a product line of ELTs which are designed to locate a downed airplane in the event of a crash. The ELTs are required by the Federal Aviation Administration in certain airplanes. The debtor's ELT is patented and sold under the unregistered trademark Emergency Beacon. It is designed to be portable and mounted in the cockpit and in life rafts.

4. The debtor also supplies for its ELTs replacement batteries in accordance with the debtor's own quality control standards which exceed the minimum standards established by the Federal Aviation Administration. These quality control standards of replacement batteries are necessary since the compact nature and technical design of the Emergency Beacon require special care and manufacture in order to have the battery packet and the ELT operate in harmony with the electronic system. In the event that a battery pack or power source is not manufactured to these high standards of care it is conceivable that the ELT will not operate properly in the event of an emergency.

5. One of the distinctive features of the Emergency Beacon is that while the unit is not waterproof, so as to enable it to be sensitive upon impact, the battery packet which furnishes the power for the Emergency Beacon is contained in a metallic waterproof case in order to allow the Emergency Beacon to function in the event of a crash over water or for use in a life raft.

6. The Artex replacement battery pack is inserted in a cardboard packet and is not waterproof. The name Artex Aircraft Supplies Inc. appears prominently on the face label without any reference to the debtor's product. It is clear that the Artex battery is distinguishable in appearance from the battery packet supplied by the debtor and is not confusingly similar in design. No purchaser would be deceived as to the source or the origin of the Artex battery packet. However, the debtor's complaint has reference to the impression created by the manner in which Artex advertises its product as a replacement battery pack for the debtor's Emergency Beacon.

7. At the hearing the debtor offered a demonstration whereby its battery packet and the Artex battery packet were simultaneously immersed in salt water for more than thirty minutes. The Artex product promptly discontinued emitting energy to a control regulator to which it was attached. The debtor's battery packet continued to function without significant change beyond the test period. Thus, in the event of an impact and downing of an airplane over a body of water, the debtor's ELT will continue to function if powered by one of its waterproof battery packets but will fail to perform if equipped with one of the Artex battery replacements. The important feature in the design of the ELT is that while it need not be waterproof in order to function properly in the event of a downing over water, the battery packet which powers the Emergency Beacon must be waterproof and sufficiently strong so as to withstand certain forces and atmospheric or environmental conditions.

8. The debtor also demonstrated at the hearing that the Artex cardboard battery packet could easily be split in half by simply holding the packet in two hands and manually applying pressure until the container snapped. The debtor's battery packet is encased in a pressure resistant container which withstood the impact of a stress test applied by a machine designed for such purpose. The need to withstand stress is an important feature of the battery packet in the debtor's Emergency Beacon because the unit is designed to radiate a signal triggered by an impact in the event that an airplane is downed in an emergency. Obviously a battery packet for an ELT that can be snapped in half manually will not function as intended in the event of strong impact caused by the forceful downing of an airplane.

9. It appears from the evidence that the battery pack manufactured by Artex, although certified by the Federal Aviation Administration, does not enable an ELT to function as intended at all times, notwithstanding atmospheric or oceanic conditions. It also appears that the Federal Aviation

Administration did not independently verify the representations made by Artex to obtain its certification since no water test was conducted although such a test is set forth in the minimum performance standards for Emergency Locator Transmitters prescribed by the Radio Technical Commission for Aeronautics. [Exhibit C] It appears that the FAA routinely does not conduct any verification tests for statements made in support of products submitted for FAA certification.

10. The debtor has introduced in evidence a brochure issued by Artex to distributors of aircraft products in which it advertises various Artex battery products as replacement batteries for ELTs manufactured by various companies, including the debtor's ELTs. The debtor's name, Emergency Beacon Corporation, appears in large letters adjacent to a picture of the Artex battery packet. Similarly, the other manufacturers' names appear adjacent to the picture of an Artex battery replacement intended for such other manufacturers' ELTs. The following information appears in the description in the brochure:

"EMERGENCY BEACON CORPORATION

This battery pack fits all Emergency Beacon Corporation's ELTs. It has an 18 month useful life.

Part No. 00–21–006"

11. The description in the brochure that the Artex battery packet "fits all Emergency Beacon Corporation's ELTs" may be literally accurate, but it is misleading and creates a false impression that the Artex battery packet is a suitable replacement for the Emergency Beacon battery and that it will perform satisfactorily under similar atmospheric and environmental conditions, whereas this impression is false. The Artex battery packet will detract from the intended purpose for which the Emergency Beacon is designed. Aircraft suppliers, pilots and the flying public are lulled into a false sense of security that an airplane equipped with an Emergency Beacon will radiate a distress signal in the event of a forced downing. While this may be the case if the original battery supplied by the debtor is in the ELT, a replacement battery sold by Artex will merely physically fit the ELT but will cause the ELT to fail in the event of a downing at sea or upon impact by a force comparable to the manual splitting demonstration at the hearing.

12. In the event that the debtor's Emergency Beacon fails to perform as intended because of the failure of an Artex battery used as a replacement for the debtor's original battery, the resultant bad publicity will cause irreparable injury to the debtor's reputation, good will and business. The public may associate such failure with the ELT manufactured by the debtor, notwithstanding that the ELT may not have performed properly due to the fact that the Artex replacement battery is not waterproof and is easily snapped apart. Thus, the successful performance of debtor's ELT is dependent upon a battery that is compatible with the unit and designed to enable the unit to perform under all emergency conditions. In light of the evidence at the hearing, the Artex battery packet is not a suitable replacement for the debtor's ELT. Hence, the advertisement that the Artex battery packet fits the debtor's ELTs is misleading and false. Such advertising, as evidenced by the brochure in question, may damage a valuable asset and property interest of the debtor, namely the good reputation associated with the debtor's patented Emergency Beacon.

## DISCUSSION

It has always been a basic tenet of trade regulation law and the law of unfair competition that it is not unfair to use the name of a well-known article and indicate that a replacement part is made "to fit" the article. *Electric Auto-Lite Co. v. P. & D. Mfg. Co.*, 78 F.2d 700, 703 (2d Cir. 1935) ("to fit Auto-Lite"); *American-Marietta Company v. Krigsman*, 275 F.2d 287 (2d Cir. 1960) ("would fit the O'Cedar 76' mop"). Since a competitor's chief weapon is his ability to represent his product as the equivalent of and cheaper than the well-known article, the only way in which this can be done is to

identify the copied article by its trademark or tradename. "To prohibit use of a competitor's trademark for the sole purpose of identifying the competitor's product would bar effective communication of claims of equivalence." *Smith v. Chanel, Inc.*, 402 F.2d 562, 567–568, (9 Cir. 1968) ("Second Chance" and "Chanel No. 5") In the absence of a misrepresentation, an advertisement that one's product fits the well-known article is usually not harmful to the reputation of the manufacturer of the well-known article if the product turns out to be inferior because the public disapproval will relate only to the inferior replacement. "If one says that his parts 'will fit' another machine and they do not, then remedy would lie only with the purchaser of the part, absent unusual circumstances." *B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1266 (5 Cir. 1971). However, what the advertiser "cannot do is to represent to the purchasing public that his own parts do meet the [well-known article's] standards", because in such case, the manufacturer of the well-known article "has the right to seek to protect its reputation and business against false representations, express *or implied*, that the copied parts have passed muster under [the manufacturer's] tests or specifications." (Emphasis added) *B. H. Bunn Co. v. AAA Replacement Parts Co.*, supra at page 1269.

Section 43(a) of the Lanham Act, which was adopted in 1946, 15 U.S.C. § 1125(a), the statutory federal counterpart to state unfair competition laws, may be invoked to prevent misrepresentations that may injure business or personal reputations, even where no registered trademark is concerned. *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 24 (2d Cir. 1976). That statute provides in part:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, . . . a false designation of origin, or any *false* description or *representation* . . . and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action by any person . . . who believes that he is or is likely to be damaged by the use of any such false description or *representation*." [Emphasis added]

Thus, under both the common law of unfair competition and the statutory counterpart incorporated in the Lanham Act, a false representation in connection with the sale of goods in commerce is actionable. The gist of the debtor's complaint is that the representation by Artex in its brochure and in advertising matter that the Artex battery packet fits the debtor's Emergency Beacons is false and deceptive. The debtor also complains that there is confusion as to the source of the Artex battery packets because the public may believe that Artex is authorized by the debtor to sell batteries for its ELTs. However, there was no evidence that anyone was confused. The Artex battery packet is clearly identified as to source. Indeed, the debtor's main point is that Artex batteries are identified too prominently in connection with the debtor's ELTs and that such practice is misleading and deceptive because the ELTs will not perform as intended if the Artex battery packets are used as replacements. The debtor contends that while the Artex battery packets may "physically" fit the debtor's ELTs they do not fit in the sense that the debtor's units will not operate in the manner intended by it if the Artex battery packets are used as replacements.

The primary function of the debtor's Emergency Beacon is to save lives by signalling for rescue in the event an airplane is downed. The debtor contends that the Artex battery packet, which is not waterproof and not enclosed in a crash-resistant casing, would cause the debtor's unit to malfunction in the event of an airplane crash, thereby tarnishing the image of the Emergency Beacon, damaging the good-will and the business of the debtor, and more seriously, causing needless deaths.

By advertising battery packets that will "fit" all Emergency Beacons, Artex impliedly represents that the replacement packet will make the Emergency Beacon function as good as new, replenished and suited for use during an emergency. The

advertisement disingenuously fails to warn the purchaser that the replacement battery will not work if the crash happens to occur over water or if the impact will break the cardboard case, as was done manually in a demonstration at the hearing. "The consumer suffers . . . from the failure of advertisers to furnish him with precise information essential for intelligent consumption . . . [M]isleading advertisements should be recognized as a method of unfair competition and a deceptive practice . . . [T]he guiding principle should be that a half-truth may be more pernicious than a blatant lie." 1 *Callman, The Law of Unfair Competition, Trademarks and Monopolies,* § 19.1(f) p. 647.

The deceptive practice in this case, proscribed under the common law of unfair competition and the Lanham Act, is the implied false representation that an Artex battery packet is a suitable replacement so as to enable the debtor's Emergency Beacon to function as intended and expected. The use of the word "fits" is a misleading half-truth implying that the Artex battery packets comply with the debtor's standards for its units. In such instance, if a manufacturer sells replacement parts "to fit" a plaintiff's product that are cheaper and have lower standards, the plaintiff has a right to protect its reputation and business against such false representation which implies that the replacement parts meet the standards required under the plaintiff's tests and specifications. *B. H. Bunn Co. v. AAA Replacement Parts Co.,* supra. Similarly, in *Electronics Corp. of America v. Honeywell,* 428 F.2d 191 (1st Cir. 1970), on remand, 358 F.Supp. 1230, aff'd 487 F.2d 513, cert. denied 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974), a preliminary injunction was granted to prevent the advertisement for sale of a replacement electric control for a large capacity oil, gas and coal burner as "easy to plug-in", when in fact it could be installed only with a considerable amount of time and expertise. The court concluded that although the description "easy to plug-in" was literally accurate, it was not accurate in the sense in which it would be read, "viz., as a comparison with

its 'target' plaintiff's Model 6008." The Court of Appeals went on to state: (428 F.2d at p. 195)

"In the light of the purpose of the brochure to replace Fireye and other specified programmers, the court's conclusion that there was no misstatement because the remarks were not directed to plaintiff's programmer is unrealistic and impermissible. This was a serious misrepresentation."

■ In the instant case, the debtor's Emergency Beacon will simply not function as designed if it is immersed in salt water as a result of an airplane crash at sea or if it is subjected to an impact sufficient to break the cardboard battery packet. Countless lives may be lost in downed airplanes and life rafts that may otherwise have been rescued had the Emergency Beacon contained a waterproof battery encased in crash-resistant casing. Since the original battery packet in the debtor's Emergency Beacon was waterproof and in a crash-resistant casing, it necessarily follows that an inferior cardboard battery packet is not a safe or suitable replacement for the original. That the Artex battery packet may "fit" into the debtor's product is a misleading representation because it infers that the Artex battery packet also meets the standards required for the original battery packet which it is to replace and that the product will then perform in accordance with its intended design.

In order to protect the debtor's product and good-will from the likelihood of injury threatened by the false and misleading advertisement, this court will exercise the authority under Section 2(a)(15) of the Bankruptcy Act of 1898, as amended, and will enjoin the continuation of that conduct which may cause harm to property within the aegis of this court. Accordingly, it appears that the debtor has established the likelihood of success in the adversary action which it commenced and is therefore entitled to an order preliminarily enjoining Artex, until a final determination of this matter, from advertising that its present battery packet, Model 00–21–006 fits in, or is

compatible for replacement use in the debtor's Emergency Locator Transmitter models, known as Emergency Beacons. The debtor shall post a bond in the sum of $1500 to insure the defendant's recovery of costs should the defendant ultimately prevail.

SUBMIT ORDER ON NOTICE.