**HYPERTHERM, INC.,**
**Plaintiff, Appellee,**

v.

**PRECISION PRODUCTS, INC.,**
**Defendant, Appellant.**

**No. 87–1489.**

United States Court of Appeals,
First Circuit.

Heard Oct. 9, 1987.

Decided Nov. 6, 1987.

Joseph M. Kerrigan with whom Kimberly M. Sack, Hamblett & Kerrigan, Nashua, N.H., John H. Pearson, Jr., and Pearson & Pearson, Lowell, Mass., were on brief, for appellant.

Ernest B. Murphy, Boston, Mass., with whom Gary Ellis Hicks and Wiggin & Nourie, Manchester, N.H., were on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Hypertherm, Inc. (Hypertherm), plaintiff-appellee, cut a considerable swath through the arcane world of plasma are electric heat technology. The firm exploited an industrial need and fashioned a lucrative niche for itself in the manufacture and sale of systems useful in cleaving metals. As an adjunct of this endeavor, Hypertherm sold consumable components and replacement parts for use with its equipment. Spying a good thing and wanting a slice of the business, so to speak, defendant-appellant Precision Products, Inc. (PPI) slashed its way into the aftermarket, offering make-do parts and components (not manufactured by or with plaintiff's permission) for sale to the trade. PPI represented

them as being interchangeable with genuine Hypertherm parts and capable of working compatibly with Hypertherm's systems. To make certain that the promotional point was not missed, appellant tried strenuously—too strenuously, as matters turned out—to downplay any dissimilarities between its products and Hypertherm's.

Although imitation is thought in some circles to be the most sincere form of flattery, the appellee was not pleased. Some months after PPI began its sales campaign, Hypertherm brought suit in the United States District Court for the District of New Hampshire. The plaintiff claimed, *inter alia,* trademark and trade dress infringement and unfair competition, predicating its suit on both federal and state law. Hot on the heels of its complaint, plaintiff moved for preliminary injunctive relief. Fed.R.Civ.P. 65.

The district court referred the motion to a United States magistrate for a report and recommendation. 28 U.S.C. § 636; Fed.R. Civ.P. 72. After conducting a comprehensive evidentiary hearing which focused on three separate types of consumable parts sold by appellant for use with Hypertherm equipment—each of which attempted to replicate a comparable artifact manufactured by plaintiff [1]—the magistrate issued a report finding that the rival components (*i.e.,* Hypertherm's "authentic" items and PPI's "ersatz" items) looked the same to the naked eye, but that PPI's parts in fact deviated from Hypertherm's specifications. For this reason, the copies, when inserted in place, caused an occasional malfunction. Moreover, PPI had closely emulated Hypertherm's packaging and assignment of parts numbers. In consequence of this combination of factors, abetted by appellant's careful choice of promotional techniques which tended to blur what few distinctions existed, end users were often confused as to the source and sponsorship of the imperfect parts. Thus, when the systems went out, plaintiff's reputation was squarely on the line.

The magistrate opined that Hypertherm would probably succeed on the merits of its claims and that, absent an injunction, it would be irreparably harmed. He specifically found that the plaintiff had satisfied each and all of the four criteria necessary for preliminary injunctive relief, *see, e.g., Massachusetts Ass'n of Older Americans v. Sharp,* 700 F.2d 749, 751 (1st Cir.1983); *Auburn News Co. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981),[2] and recommended that PPI be restrained accordingly. The district court adopted the magistrate's report, accepted the recommendations contained therein, and entered an injunction. PPI appealed.

We need not dwell on the evidence before the magistrate or on his findings. He had the benefit of examining specimens of the parties' wares in reaching a practical conclusion that appellant's trade dress was beyond the pale. We have consistently held that the trial court's inferences "drawn from its examination of real evidence" will be accepted unless clearly erroneous. *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 377 (1st Cir.1980). No error—clear or otherwise—appears in this respect. Hypertherm presented a strong *prima facie* case demonstrating a probability that it would prevail on its trade dress and unfair competition claims at trial.

Next, consumer confusion and customer uncertainty as to whether or not Hypertherm was responsible for the shoddy com-

---

**1.** The evidence showed that Hypertherm's annualized sales of these three components aggregated some $1,800,000.

**2.** These same four criteria—(1) the likelihood of merits' success, (2) the potentiality for irreparable injury, (3) a balancing of the relevant equities (especially, the hardship to the nonmovant if the restrainer issued as compared to the hardship which the movant will suffer if denied relief), and (4) the effect of granting or refusing the injunction on the public interest—govern applications for injunctive relief in the trademark/unfair competition milieu. *E.g., Camel Hair & Cashmere Institute v. Associated Dry Goods Corp.,* 799 F.2d 6, 12 (1st Cir.1986).

ponents was proven.[3] This was, in turn, a potent basis for a finding of irremediable injury. Few harms are more corrosive in the marketplace than the inability of a trademark holder to control the quality of bogus articles thought (erroneously) to derive from it. The threat of substantial damage to Hypertherm's hard-won business and reputation made out a sufficient showing of irreparable harm to warrant immediate redress. *Cf. Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1332 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978) ("damage to the goodwill and prominence of the [plaintiff's] trademark through public confusion of it with the [respondent's] trademark is, in itself, an irreparable injury").

The remaining prongs of the four-part paradigm were likewise shown. Evidence of the relative economic impact associated with giving or withholding injunctive relief was adequate, once the magistrate found the subsidiary facts in appellee's favor, to tip the balance of hardships in Hypertherm's direction. And, given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names, it was reasonable to conclude the public interest was served by an order barring appellant from continuing to cut so many corners. On this record, the court below did not abuse its considerable discretion in finding that injunctive relief *pendente lite* should issue.

■ The more troublesome question before us relates to the scope of that relief. The district court, properly we think, restrained PPI from using "words, numbers or designs which do, may or might confusingly simulate the Hypertherm marks and numbers" and from "selling plasma arc cutting systems, components or replacement parts in packaging or with labelling which is, may or might reasonably be [thought] confusingly similar to the Hypertherm trade dress...." But, the court

went further: it also forbid appellant to use the name "Hypertherm" or the Hypertherm product list or parts numbers *at all*. This, we believe, was error.

■ One has a right to ape—if he can—the unpatented product of another. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231–33, 84 S.Ct. 784, 788–89, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237–38, 84 S.Ct. 779, 781–82, 11 L.Ed.2d 669 (1964). In the absence of false representations or palming off, the sale of unpatented replacement parts by one other than the manufacturer of the original equipment is neither unlawful nor actionable. *B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1263–67 (5th Cir.1971). Even if the parts are substandard, the rule holds—so long as their origin is not obscured. *Id.* Notwithstanding some slight danger of confusion, it would (as we have said before) "be difficult to take seriously" an assertion that every such sale comprises unfair competition. *Electronics Corp. of America v. Honeywell Inc.*, 428 F.2d 191, 194 (1st Cir. 1970). Producing an unpatented machine does not give the producer a legal monopoly on its component parts. If a potentially lucrative aftermarket develops, imitators will flock to obtain and offer make-do surrogates, often claiming equivalent performance and some added premium (*e.g.*, faster delivery, cheaper pricing). In the entrepreneurial world as elsewhere, copycats have always been commonplace.

■ Given these verities, it follows logically that a firm, like PPI, which has labored (lawfully) to replicate another's parts, may ordinarily use the originator's trademark *descriptively*, that is, to identify the product it has copied, so long as no misrepresentation is made and no confusion is generated as to the source, sponsorship, or identity of the ersatz goods. In such a situation:

[The imitators] have a right to tell the public what they are doing, and to get whatever share they can in the populari-

---

**3.** Without indulging in unnecessary attention to evidentiary detail, it should be noted that Hypertherm's proof on this point covered the essence of the eight-part test which we have previously utilized as a tool for gauging likelihood of confusion in analogous contexts. *See Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1204–05 (1st Cir. 1983).

ty of the [authentic product] by advertising that they are trying to make the same article, and think that they succeed. *Saxlehner v. Wagner*, 216 U.S. 375, 380, 30 S.Ct. 298, 299, 54 L.Ed. 525 (1910) (Holmes, J.) (citations omitted). As long as an imitation is marketed and sold as such, its votarists may refer descriptively to the original (copied) product to enlighten the trade regarding the (supposed) virtues of the reproduction. In short, we agree with the Eighth Circuit that "[a]n imitator may use in a truthful way an originator's trademark when advertising that the imitator's product is a copy," so long as no confusion as to the source is likely to result. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir.1987). *See also G.D. Searle & Co. v. Hudson Pharmaceutical Corp.*, 715 F.2d 837, 842 (3d Cir.1983) (similar); *Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716, 721–22 (9th Cir.1975) (similar); *Smith v. Chanel, Inc.*, 402 F.2d 562, 563–68 & nn. 5–20 (9th Cir. 1968) (similar).

Indeed, common sense teaches that this must be the law. There would be scant rhyme or reason in opening the door to development of a nonmonopolistic aftermarket in, say, replacement parts—and then to erect insuperable barriers to confront those who successfully clamber over the threshold. Prohibiting imitators from telling others the very purpose for which their make-do articles were assembled would severely restrain competition without serving the slightest countervailing (valid) purpose. And, such a practice would be as illogical as allowing inexpensive over-the-counter medications to be sold as an alternative to pricier brand-name elixirs—but insisting they could be marketed only in plain brown wrappers, without any indication to the consumer as to either the nature of the malady to be cured or the identity of the (better-known) competing product.

In foreclosing fair use of this sort, the restraint in this case roamed too broadly. Rather than merely enjoining the defendant from continuation of the promotional practices which had been found impermissible—*i.e.*, the deceptively similar packaging, the imitative numeric designations, the masking of the true source and sponsorship of the (inferior) goods—or affirmatively mandating that appellant better identify the genealogy of its wares, the district court effectively took PPI's products off the market. Under the injunction as written, appellant was left without any efficacious way to tell the public that its goods, when clearly denominated as such, were (it thought) comparable to Hypertherm's own components and compatible with Hypertherm equipment. Though the evidence engenders small sympathy for the defendant—PPI obviously tried to take advantage of plaintiff's success, and cut too close to the bone in the process—the decree should have permitted it to use the Hypertherm name and the like in a purely descriptive sense for the limited purpose of comparative marketing.[4] That is to say, so long as PPI's make-do parts are clearly marked and promoted as such, appellant should be able to market them to the trade as being "compatible with" certain Hypertherm machinery or as being designed to replace specified Hypertherm components.[5]

It is well settled in the federal system that an appellate court can trim an injunction which, while supportable in its essence, meanders too far at its outskirts. *E.g., Spiegel v. City of Houston*, 636 F.2d 997, 1002–03 (5th Cir.1981); *Galella v. Onassis*, 487 F.2d 986, 998 (2d Cir.1973); *Winston*

---

**4.** We do not reach the question of whether, because of, say, a particularly sordid pattern of pervasive skullduggery, there may be circumstances where an injunction should sweep so broadly as to foreclose all use—descriptive and otherwise—of a rival's name and/or product designations. Here, PPI initiated some reforms before the Rule 65 hearing was held, *e.g.*, coding parts alphanumerically rather than numerically, redoing its packaging slightly. Though insufficient, these were a step in the right direction. All in all, it is clear that PPI's conduct, taken in context, was wrongful—but not so odious as to warrant the extreme sanctions which the injunction imposes.

**5.** We offer these brief examples as illustrations of what we deem to be permissible "descriptive" uses. We neither purport to catalog all such uses fully nor to limn what safeguards and controls should be attendant thereto. Those tasks are better confronted, in the first instance, by the district court.

*Research Corp. v. Minnesota Mining and Mfg. Co.,* 350 F.2d 134, 143–44 (9th Cir. 1965); *United States v. Vitasafe Corp.,* 345 F.2d 864, 870–71 (3d Cir.), *cert. denied,* 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965). We therefore affirm the grant of preliminary injunctive relief to Hypertherm, but vacate that portion of the restraint which prohibits appellant from making fair *descriptive* use of Hypertherm's name and product list in its comparative marketing. On remand, we direct the district court to revise the injunction accordingly, inserting whatever prophylactic provisions that court, in its discretion, may deem necessary to ensure that such descriptive advertising does not create any cognizable likelihood that end users will be misled as to the nature, source, and sponsorship of defendant's make-do products. The district court may also provide for whatever reporting and monitoring requirements it deems prudent, the circumstances considered.[6]

*Affirmed in part; vacated in part; remanded for further proceedings consistent herewith.* Each party to bear its own costs.

---

**6.** We remind the parties that we address ourselves herein only to the question of the preliminary injunction previously issued by the district court. We express no opinion upon the ultimate resolution of the merits at trial or as to the form and scope of a permanent injunction (should the district court, after trial, find one to be merited).