William A. SCHROEDER, in his capacity as a member and officer of the Graphic Communications International Union, AFL–CIO, CLC, an unincorporated association and Graphic Communications International Union, AFL–CIO, CLC, an unincorporated association, Plaintiffs,

v.

Siro J. LOTITO, Jr., d/b/a Arrow Letter Shop a/k/a Arrow Printing Company, Arrow Print Shop, and Imperial-Arrow Associated Services of Rhode Island, a non-business corporation, Defendants.

Civ. A. No. 83–0417 S.

United States District Court, D. Rhode Island.

Dec. 29, 1983.

Delson & Gordon by Martin R. Ganz-glass, Washington, D.C., Roberts, Carroll, Feldstein & Tucker by Berndt W. Anderson, Providence, R.I., for plaintiffs.

Michael J. Kiselica, Cranston, R.I., for defendants.

## OPINION

SELYA, District Judge.

### I.

In this action, the plaintiffs seek relief for alleged violations of assorted federal and state statutes and non-statutory legal principles prohibiting unfair competition, deceptive trade practices and trademark in-

fringement. Specifically, the plaintiffs assert that defendants' use of a union label which is "confusingly similar" in appearance to plaintiffs' mark(s) derogates 15 U.S.C. § 1114, 15 U.S.C. § 1125, R.I.Gen. Laws §§ 6–2–1 *et seq.* and R.I.Gen.Laws §§ 6–13.1–1 *et seq.;* and is, likewise, violative of the common law of unfair competition. The defendants offer a medley of defenses, asserting that (i) this court is bereft of subject matter jurisdiction, (ii) plaintiffs have no standing, and finally (iii) plaintiffs' case is wanting on the merits. By order entered September 19, 1983, the court merged the plaintiffs' request for preliminary injunction with trial on the merits pursuant to Fed.R.Civ.P. 65(a), and bifurcated the resultant trial. In consequence of that order, and expedited by several stipulations of fact, the liability aspects of the action were tried to the court, sitting jury waived, in late October of 1983. Following that bench trial, decision was reserved. This opinion constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## II.

Plaintiff Schroeder is an officer of the Graphic Communications International Union (GCIU), an unincorporated labor organization. The GCIU, itself a plaintiff in this litigation, was born in wedlock of a marriage between the Graphic Arts International Union (GAIU) and the International Printing and Graphic Communications Union (IPGCU). The GCIU is also the successor to both the Lithographers and Photoengravers International Union (LPIU) and the Amalgamated Lithographers of America (ALA). The membership of the GCIU consists of lithographers, photoengravers, printers, bookbinders and persons pursuing allied trades.

The GCIU presently owns a trademark originally registered and used by the GAIU to identify goods produced by companies employing GAIU members. This mark is registered in the United States Patent Office, as well as in each of the fifty states and the District of Columbia. The GAIU mark has likewise been protected throughout Canada. In addition to the GAIU mark, the GCIU also owns the trademark originally registered by the LPIU in 1964 with the United States Patent Office and with the Rhode Island Secretary of State. And, although no longer regularly used, the GCIU similarly controls (and has in the past utilized) the ALA mark. The GCIU has consistently and vigorously enforced its perceived right to the exclusive use of these symbols.

Essentially, all of these marks serve a common purpose: they are placed on commercially-printed materials to designate and distinguish the work as having been produced by union labor. Such marks, generally, have come to be known as "union bugs." Common sense teaches, and the evidence shows, that certain customers prefer to patronize union shops for printing purposes—and to have it known that they act upon this preference. The apterous union bug proclaims to all who care to take notice that the person who commissioned the printing shares this orientation and has ceded his custom to print shops affiliated with organized labor. The presence of a beetle is of vital concern, especially, to those seeking elective office, many of whom feel that it is prudent—perhaps essential—to their electoral efforts tangibly to demonstrate their sympathy to, and oneness with, the labor movement. And, in the world of print, the GCIU is not just a garden-variety purveyor of bugs: it is a Colossus among the unions active in the industry. In Providence, for example, there are thirteen printeries catering to the general public affiliated with organized labor, of which no less than eleven are signatory to collective bargaining agreements with the GCIU.

Defendant Lotito is the president of Imperial-Arrow Associated Services of Rhode Island (Imperial-Arrow), a non-business corporation which owns and operates the Arrow Print Shop (Arrow), formerly known as the Arrow Letter Shop. Imperial-Arrow and Arrow were added as party defendants prior to trial. Arrow is in the business of

printing invitations, announcements, reception cards and the like. None of Arrow's employees are members of any labor union; in fact, there has never been a collective bargaining agreement in effect at the company.

The events giving rise to this litigation began to unfold approximately five years ago when Lotito received literature from an organization euphemistically called the American Independent Lithographers Union, Inc. (AILU). The AILU was not a labor organization, nor was it engaged in the printing industry. It had, however, built a better mousetrap: it trumpeted its services as a handy panacea to combat "the experience of losing printing jobs to another printer just because the other printer could put the 'Union Label' on his work..." Exhibit 26. According to the AILU literature, for a one-time membership fee of $20.00 and monthly dues of $10.00 thereafter, a wondrous eclosion would occur: the subscribing shopowner would receive "slicks" of the AILU union label and the opportunity, of course, to represent his business as a "union shop"—all without having to worry about such annoying details as collective bargaining, union organizers, wage scales, fringe benefit packages and the like.

Being aware of the advantage which the appearance of "union" affiliation could confer in attracting certain types of business,[1] the defendants accepted the AILU's invitation with alacrity. They plainly hoped that the make-pretend bug would prove to be the eruciform larva which would transform the torpid caterpillar of Arrow's political printing business into a soaring butterfly. Since that time, Lotito has represented the fact of his union affiliation and has used the inquiline AILU beetle on divers occasions, almost invariably in connection with political assignments.

Prior to the institution of this action, the GCIU brought suit against AILU in the United States District Court for the Eastern District of Kentucky. On October 8, 1982, the district court entered a consent decree enjoining AILU from, *inter alia*, continuing to use, sell, or distribute its mark in commerce. The order further required that AILU notify its members in writing of the existence and terms of the injunction. Lotito claims that he never received such notice. But, this court does not credit his denial.

When viewed in registration-size mock-ups, the AILU bug is discernible from the GCIU marks. The points of distinction slip into oblivion, however, in the miniaturized forms in which the marks are routinely used on printed materials. The AILU bug, like all three of the plaintiffs' labels, consists principally of a geometric shape surrounding a word or phrase identifying the organization. Furthermore, the diamond-shaped configuration of the AILU mark replicates the predominant design of the LPIU mark. The consumer, of course, will rarely (if ever) be afforded the luxury of a side-by-side comparison of the authentic and ersatz marks. And, the typical patron of a printing establishment will doubtless rest secure in the knowledge that the desired bug appears to be embossed thereon. Thus, in actual use, there is no question but that the marks are confusingly similar—a circumstance which is exacerbated by the fact that the most prominent feature of the AILU mark (indeed, the only portion readable by the naked eye in actual use) is its ostentatious display of the phrase "UNION LABEL."

It is against this backdrop that the case at bar arose. The controversy dates back to a printing job which the defendants performed in the spring of 1982. An election year was at hand, and the aestivation of the political dry season could no longer be tolerated. Thomas DiLuglio, the incum-

---

1. AILU, in responding to Lotito's application to join, stated:

 We feel that you have made a wise and profitable decision in affiliating with American Independent Lithographers Union, Inc.

You should realize returns immediately. One category of printing Campaign material for politicians, is an opportunity that probably was not available to you before now.
Exhibit 4.

bent lieutenant governor of Rhode Island, peered into his campaign warchest, and was apparently dissatisfied with the meagre contents. To remedy this situation, Lieutenant Governor DiLuglio determined to host a reception and to test the fund-raising waters. He specifically admonished his aides to make sure that the invitations to this gala affair were printed by a union printer and embossed with a union bug—as, at an earlier time, DiLuglio had been subjected to criticism, obloquy and scorn for using a non-union shop (apparently unwittingly) to produce political printing.

With this admonition ringing in her ears, Cynthia Simeone, a planning specialist in the lieutenant governor's office, acting on behalf of DiLuglio's campaign committee, contacted Lotito. He assured Simeone that Arrow could do the job, and he assuaged her fears: Arrow was a union shop and had a union bug, which would be displayed on the invitations. Encouraged by these blandishments, Simeone and two fellow DiLuglio aides, Jeanne Ballirano and George Radican, ventured to the Arrow premises. All of these individuals testified unequivocally that Lotito held Arrow out to be a union shop, reassured them that the invitations would bear the desired beetle, and showed them a card which he claimed was confirmatory of Arrow's right to utilize the union label. The plastic-encased card, which Lotito testified was his AILU membership ducat, was not closely examined by any of the three political organizers. Lotito discretely refrained from indicating that he had no arrangement with any labor union, or that Arrow's employees were not unionized. Indeed, Lotito proclaimed to his three visitors that he was aware of the hornets' nest which had been stirred up when DiLuglio's committee inadvertently distributed invitations fraudulently embossed with a union bug by a non-union shop, and insinuated that no such stinging response would be attendant upon dealings with Arrow.

At trial, Lotito repeatedly maintained that, in making such representations, he had always understood that "the owners were the union;" and that the bug was merely a device to identify such membership. During his deposition, however, Lotito had stated that, to his knowledge, a union bug signifies that a company has labor union members in its employ. Simeone, Ballirano and Radican were credible witnesses; and, to the extent that Lotito's testimony was at variance with their accounts, it strains credulity and is not worthy of belief. The probative evidence at trial was to the effect that Lotito never mentioned that Arrow's AILU affiliation was anything but a union/employee relationship; and that Lotito consciously and designedly attempted to create and to nurture this impression.

Lotito also testified that there was no substantial discussion as to who would receive the invitations. This testimony is not controverted. Lotito, consequently, claimed that he did not know that some of the invitations would be sent out of Rhode Island. He conceded, however, that had he given the matter any thought, he would have realized that invitations soliciting donations to political fund-raisers are mailed or delivered wherever politicians sense even the slimmest hope of favorable response. After all, the quest for campaign contributions, particularly for a major office-holder, knows no geographic boundaries (and indeed, few restraints of any kind, short of those imposed by law). Relying on the representations of the defendants, the DiLuglio committee ordered invitations from Arrow. These printed materials were received and were thereafter disseminated by the committee in various states. They bore the AILU mark.

In May of 1983, Joseph Vitale, president of Local 39P of the GCIU, based in Providence, first saw an invitation to the lieutenant governor's May 19th fund-raiser. Vitale and Thomas Johnson, a member of the Executive Board of Local 39P, lost little time in ascertaining the source of the printing and sojourning to Arrow in order to investigate the matter. At first, Lotito was forthcoming. He acknowledged that Arrow had a union label, and showed it

pridefully to his guests. But, after Vitale and Johnson identified themselves as officials of the GCIU, Lotito told them to vacate the premises. There was conflicting testimony with respect to the extent to which Vitale and Johnson were able to articulate their views before they were forced to leave. In any event, their visit was followed promptly by a letter from Schroeder, a vice-president of the GCIU, advising of the injunction in effect against AILU and urging the defendants to cease and desist from using that organization's label. When no such commitment emerged, the instant action ensued.

### III.

The defendants contend, as a threshold matter, that this court lacks subject matter jurisdiction over the claims asserted in the second amended complaint. Specifically, defendants argue that plaintiffs have failed to allege and prove facts which show that defendants' use of the purportedly infringing mark occurred in interstate commerce, an essential requirement for suits brought under the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 *et seq.* And, defendants reason, since this court lacks jurisdiction over plaintiffs' federal claims, and no independent basis for jurisdiction over the state law claims has been proffered, this action must be dismissed.[2]

Pursuant to 28 U.S.C. § 1338, this court has original jurisdiction of suits arising under any act of Congress relating to the protection of trademarks and any substantially related state law claims of unfair competition joined thereto. *Koufakis v. Carvel*, 425 F.2d 892, 898 (2d Cir.1970). 15 U.S.C. § 1121 further provides that the district courts shall have original jurisdiction of all actions under the Lanham Act without regard to amount in controversy or diversity of citizenship.

In this action, plaintiff asserts claims under two sections of the Lanham Act, an enactment which, while salutary and pro-

gressive, has been aptly described in this circuit as "delphic." *DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499, 511 (1st Cir.1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976). Both of the relevant statutes, 15 U.S.C. §§ 1114 and 1125(a), are set out in material part in the margin. *See* notes 5 and 6, *post.* Section 1114 provides relief against any person who uses in commerce a reproduction, counterfeit or colorable imitation of a federally registered trademark. Section 1125, the federal unfair competition provision, imposes civil liability on any person who uses a false designation of origin, or any false description or representation in connection with goods in commerce. The Lanham Act further provides that "[t]he word 'commerce' means all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127; thus, the scope of the Act is equal to the sweep of congressional power under the Commerce Clause, Article I, § 8, clause 3 of the Constitution. *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 558 (1st Cir. 1982).

It is well settled that a plaintiff may satisfy the jurisdictional requirement of use in commerce by demonstrating either: (i) that the infringing mark, or the false designation or misrepresentation, was used in connection with goods in commerce, or (ii) that the defendants' use, while wholly intrastate, tended to have a substantial effect on plaintiffs' interstate business. *See Coca-Cola Co. v. Stewart*, 621 F.2d 287, 290 (8th Cir.1980); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 488–89 (5th Cir.1971); *Tiffany & Co. v. Boston Club, Inc.*, 231 F.Supp. 836, 841 (D.Mass.1964). Moreover, "an adverse effect on the sales or goodwill of one whose trademark is used in interstate commerce is a sufficiently substantial effect on interstate commerce ... to invoke the protection of the Lanham Act...." *Purolator, Inc. v. EFRA Distributors, Inc.*, 687

---

2. The plaintiffs have not alleged that this court possesses diversity jurisdiction under 28 U.S.C. § 1332.

F.2d at 559; *see also Maier Brewing Co. v. Fleischmann Distilling Co.*, 390 F.2d 117, 120 (9th Cir.) *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968); *Golden Door, Inc. v. Odisho*, 437 F.Supp. 956, 962 (N.D.Cal.1977), *aff'd*, 646 F.2d 347 (9th Cir. 1980); *Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.*, 561 F.Supp. 1014, 1021–22 (D.R.I.1983).

■ With respect to the former criterion, namely, that the improper use be in interstate commerce, although it was actually the purchaser which put the AILU-embossed invitations into the stream of interstate commerce, any reasonable person printing invitations for a large-scale political fund-raiser such as the DiLuglio fete would have surmised that at least some of the invitations would be sent out of state. Indeed, Lotito conceded as much in response to the court's questioning at trial. The plain inference to be drawn from the credible evidence is that Lotito, when he accepted the job and embossed the reception cards with the AILU label, knew full well that his handiwork would be disseminated, in part, beyond Rhode Island's borders. Consequently, if the defendants' conduct is actionable, it can be said to have occurred in interstate commerce.

■ In any event, the defendants' actions doubtless satisfy the alternative test for Lanham Act jurisdiction. There are ample facts in the record to support a finding that, even if the defendants' use was entirely intrastate in nature, it nevertheless could have a substantial effect on the interstate use of the GCIU marks. As noted previously, the First Circuit has taken a fairly expansive view of this concept; a substantial effect on interstate commerce can be demonstrated by a showing that there is an adverse effect on the plaintiffs' sales or goodwill. *Purolator Inc. v. EFRA Distributors, Inc.* 687 F.2d at 559. The court is not dealing here with a plaintiff whose interests are essentially local in nature. On the contrary, the GAIU mark is registered and in use throughout the United States and Canada. Similarly, the LPIU label is registered nationally. As in *Gold-en Door, Inc. v. Odisho*, 437 F.Supp. at 962, the allegedly actionable conduct thus may affect the interstate reputation of the GCIU, its ability to control its reputation, and its attractiveness to prospective members, in a sufficiently impactful way that the policies underlying the Act would be subverted. *Cf. Railroad Salvage of Conn., Inc.*, 561 F.Supp. at 1022. Accordingly, the court holds that the defendants' challenge to its federal question jurisdiction under 28 U.S.C. § 1338 is meritless; and consequently, the defendants' corollary challenge to the court's pendent jurisdiction collapses of its own weight.

## IV.

The defendants next contest plaintiffs' standing to assert, in this court, the claims limned in the second amended complaint. Defendants orchestrate this assault on two fronts. Citing cases such as *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the first prong of defendants' argument is grounded upon the well-settled notion that a federal court may only hear cases in which the plaintiff alleges a concrete and personal injury. The defendants contend that the facts at bar are insufficient to show plaintiffs' personal stake in the outcome and, in any event, that the plaintiffs could not possibly have such an interest because the marks for which protection is sought are collective, rather than individual, marks.

■ While carefully crafted and vigorously advanced, this asseveration is, at bottom, unpersuasive. It is, first of all, based on an inaccurate characterization of plaintiffs' proof. Contrary to the defendants' assertion, the gravamen of the plaintiffs' action is not that the general public is being injured by the devious tactics of Arrow, Arrow-Imperial and Lotito. Rather, that the public is confused is merely an incident of the GCIU's claim that the de-

fendants' improper use of the AILU mark is causing injury to the GCIU itself. Secondly, defendants' reliance on cases such as *Duke Power, Warth* and *Sierra Club* is misplaced. Decisions such as these are concerned, fundamentally, with the proper role of the courts in a democratic society where each of the coordinate branches of government have limited and carefully defined powers. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37, 96 S.Ct. 1917, 1923, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. at 2204. The Supreme Court has, therefore, articulated the proposition that an individual's abstract concern with a matter which might be affected by an adjudication is not sufficient to invoke a federal court's jurisdiction. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. at 72, 98 S.Ct. at 2630; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 40, 95 S.Ct. at 1925. Instead, Article III of the Constitution requires that a plaintiff allege a concrete injury which is "fairly traceable" to the defendant's purportedly illegal conduct. *Duke Power Co.,* 438 U.S. at 72, 98 S.Ct. at 2630. This court has no quarrel with the dogma of these cases. Yet, when the facts at bar are fairly subjected to the scrutiny which the caselaw demands, there is no question that the plaintiffs' concern as evidenced here is anything but abstract, and that the claimed injury is sufficiently personal. GCIU's standing to sue cannot be gainsaid.

■ Implicit in this finding is the court's rejection of the contention that, because the GAIU, ALA and LPIU marks are collective marks, the plaintiffs *a fortiori* could not have standing to bring this action. It is true that a collective mark is used by the members of the organization which owns or registers the mark and not by the owner organization (which does not itself produce or sell goods or perform services), *see* 3 Callman, UNFAIR COMPE-

TITION, TRADEMARKS, AND MONOPOLIES § 17.18 (4th ed. 1983), and that at one time a collective mark was for that reason not viewed as a technically valid trademark. *See Baker v. Master Printers Union of New Jersey,* 34 F.Supp. 808, 812 (D.N.J.1940).[3] But whatever doubts might historically have existed regarding the protectability of collective marks under the trademark laws have been eroded by legislative enactment, *see, e.g.,* 15 U.S.C. § 1054 (expressly providing for the registration of collective marks), 15 U.S.C. § 1127 (" 'person' ... includes a firm, corporation, union, association, or other organization..."), R.I. Gen.Laws § 6–2–1 (" 'person' [includes] any individual, firm ... association, union or other organization"), and by evolving notions of fairness in modern decisional law. *See,* Callman, *op. cit.,* § 17.18. And, where the safeguarding of a valid collective mark against infringement by a third party is sought, it is wonted practice for the owner organization to bring suit on behalf of its members. *E.g., Cross v. Oneida Paper Products Co.,* 117 F.Supp. 919 (D.N.J.1954) (union trademark); *Fitzgerald v. Block,* 87 F.Supp. 305 (E.D.Pa.1949) (same). The pecuniary interest of the GCIU in halting the diversion of trade from union shops to Arrow is both manifest and adequate to confer standing. *Cf. Potato Chip Institute v. General Mills, Inc.,* 333 F.Supp. 173, 179 (D.Neb.1971), *aff'd,* 461 F.2d 1088 (8th Cir.1972); *Mutation Mink Breeders Association v. Lou Nierenberg Corp.,* 23 F.R.D. 155, 160–61 (S.D.N.Y.1959). The defendants cite not a single case which stands for the proposition which they so boldly assert, and this court will not willy-nilly relegate otherwise-valid collective marks to some uncharted limbo where they can be ravaged with impunity in even the most egregious instances.

■ Defendants' remaining argument as to standing is on a different footing. That thrust is addressed to plaintiffs' claim under R.I.Gen.Laws §§ 6–13.1–1 *et seq.,* the

---

**3.** As *Baker* recognizes, of course, such objections as could be raised on this basis would be applicable, in any event, only to trademark claims as opposed to unfair competition claims. 34 F.Supp. at 812.

so-called Rhode Island Deceptive Trade Practices Act. As the defendants correctly note, § 6–13.1–5 allows the Rhode Island Attorney General to bring an action to enjoin deceptive trade practices. And under § 6–13.1–5.2, "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes" may bring an action to compensate him/her for losses occasioned by deceptive trade practices. The attorney general is not a party to these proceedings; and the plaintiffs cannot by any stretch of the imagination tuck themselves within the citizen suit provision of § 6–13.1–5.2. The inescapable inference which flows from the legislative scheme is that the General Assembly intended the entitlement to sue under its Deceptive Trade Practices Act to be limited to those classes of persons designated

thereunder. *Cf. D'Antuono v. CCH Computax Systems, Inc.*, 570 F.Supp. 708, 713 (D.R.I.1983). Since the plaintiffs are not within the grouping of persons permitted to prosecute private actions under the state statute, the claims asserted under R.I.Gen. Laws §§ 6–13.1–1 *et seq.* must be dismissed.[4]

### V.

Inasmuch as the court has determined that the plaintiffs lack standing to sue under R.I.Gen.Laws §§ 6–13.1–1 *et seq., see* text and note 4, *ante*, there remain for adjudication causes of action for federal trademark infringement, 15 U.S.C. § 1114,[5] Lanham Act unfair competition, 15 U.S.C. § 1125,[6] state trademark infringement under R.I.Gen.Laws § 6–2–11,[7] and common

4. Count III of the second amended complaint contains both common law claims of unfair competition and the interdicted statutory claim. Thus, count III should stand, albeit shorn of its statutory trappings.

5. 15 U.S.C. § 1114 provides in relevant part:
 (1) Any person who shall, without the consent of the registrant—
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
 (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, sign, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion or to cause mistake, or to deceive.
 shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

6. 15 U.S.C. § 1125 provides in relevant part:
 (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any

false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

7. R.I.Gen.Laws § 6–2–11 reads in its entirety as follows:
 6–2–11. Infringement.—Subject to the provisions of 6–2–14, any person who shall:
 (a) use, without consent of the registrant, any reproduction, counterfeit, copy, or colorable imitation of a mark registered under [§§ 6–2–1 to 6–2–15] in connection with the sale, offering for sale, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services; or
 (b) reproduce, counterfeit, copy or colorably imitate any such mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used upon or in conjunction with the sale or other distribution in the state of such goods or services, shall be liable to a

law unfair competition. The court must ascertain whether or not the plaintiffs have established a right to relief under any or all of these multiple theories.

■ The operative federal trademark provision, 15 U.S.C. § 1114, proscribes the use of any reproduction of a registered mark in connection with the sale of goods when such use is likely to cause confusion, mistake or subterfuge. The essence of this offense is the passing off of one's goods or services as being those of another. *Pignons S.A. de Mecanique v. Polaroid Corporation,* 657 F.2d 482, 486–87 (1st Cir. 1981); *Corning Glass Works v. Jeanette Glass Co.,* 308 F.Supp. 1321, 1325 (S.D.N. Y.), *aff'd,* 432 F.2d 784 (2d Cir.1970); *Quality Chekd Dairy Products Association v. Gillette Dairy of Black Hills, Inc.,* 337 F.Supp. 239, 241 (D.S.D.1971). Thus, in an action for trademark infringement in its purest form, the crucial question is whether a consumer would be likely to experience confusion with respect to the identity of goods or services because of the use of similar marks by the opposing parties. *See Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,* 616 F.2d 440, 443 (9th Cir.1980). The Fifth Circuit has synthesized the elements of a § 1114 claim for trademark infringement into a five-part model. *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 510 F.2d 1004, 1009–10 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 *reh'g denied,* 423 U.S. 991, 96 S.Ct. 408, 46 L.Ed.2d 312 (1975). The model, as tailored to this case, would require the court to find that the defendants used (i) a counterfeit or colorable imitation of plaintiffs' mark(s) (ii) without the GCIU's consent, (iii) in commerce, and (iv) in connection with the distribution or sale (or offering for distribution or sale) of printed goods and-or printing services, under circumstances where (v) such use was likely to deceive or to engender confusion.

■ A careful analysis of the evidence *sub judice* reveals that this case does not fit comfortably into the restrictive confines of § 1114. Plainly, the second, third and fourth elements of the model are fulfilled. As suggested earlier, however, the first benchmark is not easily achieved if one views the rather dissimilar collection of marks in the abstract. Yet, the physical resemblance of the marks is not always dispositive. *Gordon's Dry Gin Co. v. Eddy & Fisher Co.,* 246 F. 954, 955 (D.R.I. 1917). And, this is exquisitely true where the symbols, in their accustomed usage, are seen only in miniature. The union bug, in its conventional commercial adaptation, crawls only in a microcosmos. In the tiny reductions which are the praxis in the trade, the distinctions between the labels blur; and, as actually used, the court finds that the AILU mark is exactly what the defendants intended it to be: a colorable imitation of one or more of the GCIU's symbols, particularly the LPIU emblem. *See Baker v. Master Printers Union of New Jersey,* 34 F.Supp. at 812.[8] The inevitability of this finding is made manifest when it is recalled that "[a]n average purchaser does not retain all the details of a mark, but rather the mental impression that the mark creates in its totality." *T & T Manufacturing Company v. A.T. Cross*

---

civil action by the owner of such registered mark for any or all of the remedies provided in § 6–2–13 except that under this section the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such mark is intended to be used to cause confusion or mistake or to deceive.

**8.** In *Baker,* the International Typographical Union brought suit to enjoin the defendant's use of a union bug which was similar to the plaintiff's. Like the AILU, the defendant in *Baker* was an owner organization whose members operated non-union shops but nevertheless used a "union" bug designed by the association. Noting the "deliberate, calculated, and not too subtle fraud" on the part of the defendant, 34 F.Supp. at 811, the court found the defendant's mark to be deceptively similar. In so doing, the court disregarded certain admittedly non-matching features, and observed: "It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Id.*

*Company,* 449 F.Supp. 813, 820 (D.R.I.), *aff'd,* 587 F.2d 533 (1st Cir.1978), *cert. denied sub nom. A.T. Cross Co. v. Quill Co., Inc.,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979). In the case at hand, the impression created—falsely—is that the goods originate from a closed shop, i.e., that they were produced by employees affiliated with organized labor. The conclusion is compelling that, without the public perception of the signification of the plaintiffs' marks, the AILU label would be of no utility whatever. While an inexact copy, the AILU mark is a sufficiently colorable imitation to give rise to a claim under 15 U.S.C. § 1114.

■ An even closer question is presented as to the fifth—and most crucial—element of the *Dallas Cap* model, namely, confusion or deceit, given the technical prerequisites for such a finding. Despite the rather explicit statutory language, courts have long stated, as if by rote, that the essence of such a claim is the palming off of goods or services as being either produced or sponsored by the registrant. *See Control Components, Inc. v. Valtek, Inc.,* 609 F.2d 763, 770 (5th Cir.), *reh'g denied,* 616 F.2d 892 (5th Cir.), *cert. denied,* 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). The instant plaintiffs are not producers of goods nor direct purveyors of services; and the caselaw dealing with sponsorship, while sparse and factually distinguishable, gives pause as to whether plaintiffs' sponsorship of the use of the GCIU marks is within the ambit of the model. *Cf. Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation,* 549 F.2d 368, 389 (5th Cir.1977) ("we cannot conclude that a seller of boxes bearing Kentucky Fried's marks is necessarily trading on the good name built by Kentucky Fried ... we do not believe [*Dallas Cap*] equates knowledge of the symbol's source with confusion sufficient to establish trademark infringement"). Be

that as it may, "the Lanham Act clearly contemplates that owners of collective marks ... receive the same treatment as holders of more orthodox trademarks." *Professional Golfers Association v. Bankers Life & Casualty Company,* 514 F.2d 665, 668 (5th Cir.1975); and in the real world, the GCIU has a stake in, and surely sponsors, its protected marks. Thus, while recognizing that virgin terrain is underfoot, the court concludes that, if confusion and-or deceit is involved, the plaintiffs' sponsorship is adequate to bring those components into play.

■ The First Circuit has recently set forth eight factors to be used in assessing the element of likelihood of confusion in an action for trademark infringement. *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 at 1204–1205 (1st Cir.1983). *See also Leathersmith of London, Ltd. v. Alleyn,* 695 F.2d 27, 29–30 (1st Cir.1982); *Pignons S.A. de Mecanique v. Polaroid Corporation,* 657 F.2d at 487–88; *Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.,* 561 F.Supp. at 1022-23.[9] Applying this standard, the similarity of the marks (discussed *ante*) is sufficient in actual use to meet the *Astra* standard. And, while the plaintiffs do not themselves manufacture goods, the competing marks are used on identical printed products, look toward the same clientele, hold out the same enticement (the appearance of labor union support), and flow in the self-same channels of trade. There is evidence of actual confusion[10] and of the strength of the GCIU's marks, inferable from its prophylactic efforts. Last but surely not least, the defendants' intent in procuring and employing the AILU label is and has been venal and altogether unsavory: Lotito embarked on a meretricious course of conduct calculated to deceive and mislead prospective customers into thinking that his goods are the products of a unionized establishment. The likelihood

---

**9.** Because of the novel aspects of this case, alluded to above, not all of these criteria are directly apposite. But, while analogy must be employed to account for these variations, the

essence of the *Astra* test can be meaningfully utilized.

**10.** *See* text *post.*

that the consumer public has been and will be duped by this scurrilous practice is great; the defendants sold their goods in the knowledge—indeed, in the hope and expectation—that the public would reflexively identify them as being produced under bona fide union auspices. The confusion/deceit requirement has been met.

 Accordingly, the court finds that the defendants are liable to the plaintiffs for trademark infringement under 15 U.S.C. § 1114; and, for the same reasons (and predicated on the same findings of fact), the defendants are liable to the plaintiffs for violation of R.I.Gen.Laws § 6–2–11.

## VI.

 At first blush, the plaintiffs' unfair competition case is a clearer one; but here, too, legal problems lurk. The credible evidence is that Lotito's use of the AILU mark creates the false impression that the defendants' products are printed by a union shop. Thus, the unsportsmanlike mercantile conduct complained of sounds, in a very real sense, of false advertising. It is clear that trademark infringement is but a narrow facet of the broader law of unfair competition. *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627, 632 (7th Cir.), *cert. denied*, 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968). *See also* 1 J. McCarthy, TRADEMARK AND UNFAIR COMPETITION § 2.2 (1973). Consequently, although a valid claim of trademark infringement will normally by its terms simultaneously state a claim for unfair competition as well, *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 510 F.2d at 1010, the converse is not true. And, a viable unfair competition claim may rise, like the storied Phoenix, from the ashes of an unsuccessful trademark claim. *Professional Golfers Association v. Bankers Life & Casualty Co.*, 514 F.2d at 671. While it is true that the plaintiffs' § 1114 claim is not a burnt-out case, *see* Part V, *ante*, it does not pass muster with a flourish of absolute certitude. And where (as here) a claim of trademark infringement, although zoetic, is at the outer periphery of § 1114, the shadings of gray can often be more completely dissipated under the § 1125 glass or in the light of the common law.

15 U.S.C. § 1125(a), among other things, prohibits the use of "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same." It allows a civil action to be brought by "any person who believes that he is or is likely to be damaged" by such use.

Relying on cases such as *American Consumers, Inc. v. Kroger Co.*, 416 F.Supp. 1210 (E.D.Tenn.1976), and *Samson Crane Co. v. Union National Sales, Inc.*, 87 F.Supp. 218 (D.Mass.1949), *aff'd mem.*, 180 F.2d 896 (1st Cir.1950), the defendants first argue that § 1125(a) does not encompass claims for false advertising but instead, that the reach of this section is limited to offenses which are equivalent to the misuse of trademarks, that is, the palming off of one's goods as those of another; or, in the alternative, even if material misrepresentations other than those which occur in the palming off type of situation are actionable under § 1125(a), the misstatements must relate to the inherent quality of the goods or services. The rule which evolved out of *Samson Crane*, and which arguably limits the scope of § 1125(a) to cases in which palming off occurred, has been variously characterized as a limitation on an individual's standing to sue or as a circumscription of the substantive scope of the statute itself. *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980). The rule represents an awkward embrace of the rather cumbersome restrictions imposed by the common law on false advertising claims. *Ely-Norris Safe Co. v. Mosler Safe Co.*, 7 F.2d 603, 604 (2d Cir. 1925), *rev'd on other grounds*, 273 U.S. 132, 47 S.Ct. 314, 71 L.Ed. 578 (1926); 2 McCarthy, *op. cit.*, § 27:1. Such unguent receptivity in effect sanctifies a host/parasite relationship between

§ 1125(a) and the strictures of preexisting jurisprudence.

At common law, the principal obstacle to bringing suit against a competitor for false representations was the requirement that the aggrieved party suffer actual injury proximately caused by the wrongdoer's conduct. *Id.* Since, in the open market, many sellers typically vend the same type of goods, it is next to impossible for a plaintiff-competitor to prove that "but for" the defendant's conduct he would have received a particular buyer's custom. *Id.* Thus, under the common law, most suits for false advertising were effectively foreclosed.[11] The *Samson Crane* court, apparently engrafting this restriction by implication onto the Lanham Act, concluded that § 1125(a) was intended only to apply to acts which are akin to trademark infringement. *Samson Crane,* 87 F.Supp. at 221–22. This result was reached notwithstanding a congressional choice of language which seemed to indicate the contrary.[12]

There is, however, a rather sizeable fly in the defendants' *Samson Crane* ointment. Over the past several decades, an impressive array of courts, including at least one in this circuit, have expressly declined to follow the straight and narrow path originally set out in *Samson Crane,* and have instead concluded that § 1125(a) applies equally to other kinds of misrepresentations. *U-Haul International, Inc. v. Jartran, Inc.,* 681 F.2d 1159, 1161–62 (9th Cir.1982); *Johnson & Johnson v. Carter-Wallace, Inc.,* 631 F.2d at 189; *L'Aiglon Apparel v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3d Cir.1954); *Skil Corporation v. Rockwell International Corporation,* 375 F.Supp. 777, 785–6 (N.D.Ill.1974); *Electronics Corp. of America v. Honeywell, Inc.,* 358 F.Supp. 1230, 1233 (D.Mass.), *aff'd,* 487 F.2d 513 (1st Cir.1973) (per curiam). The Ninth Circuit's decision in *U-Haul* is of particular interest, as it distinguished (and implicitly overruled) an earlier precedent of that court, *Chamberlain v. Columbia Pictures Corp.,* 186 F.2d 923, 924–25 (9th Cir.1951), which was of like tenor, and compatible vintage, as *Samson Crane.* The trend, however, has not been uniform; and there is current respectable authority which continues to hew to the *Samson Crane* line. *See, e.g., American Consumers, Inc. v. Kroger Co., supra.* Whether § 1125(a) encompasses claims alleging misrepresentations other than the classic transgression of palming off appears to be an unsettled question in this circuit. *Compare Salomon/North America, Inc. v. AMF, Inc.,* 484 F.Supp. 846, 849 (D.Mass.1980) (§ 1125(a) applies only to claims alleging a palming off and not to other forms of deception), *with Electronics Corp. of America v. Honeywell, Inc.,* 358 F.Supp. at 1233 (1125(a) applies to other types of misrepresentations in addition to those traditionally prohibited under the trademark laws).[13]

---

**11.** One familiar exception to the strict common law rule occurred in those instances where the plaintiff was the only source (apart from the defendant) of the type and kind of goods at issue. *See Electronics Corporation of America v. Honeywell, Inc.,* 428 F.2d 191, 194 (1st Cir.1970) (citing *Ely-Norris Safe Co. v. Mosler Safe Co.,* 7 F.2d at 604).

**12.** Section 1125(a) speaks of *"any* false description or representation." (Emphasis added).

**13.** This court's view that the question is open is not universally held. *See Salomon/North America, Inc. v. AMF, Inc.,* 484 F.Supp. at 849. In *Salomon/North America,* Chief Judge Caffrey carefully reviewed the recent decisions in this circuit dealing with the scope of § 1125(a) and concluded that *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154 (1st Cir.1977) resolved that the statute does not apply other than to claims cast in the trademark infringement mold. While this court's respect for Judge Caffrey's acumen and scholarship is great, it does not share his conclusion or concur in his reasoning on this point. The history of the treatment of this issue in this circuit is illuminating.

In *Electronics Corp. of America v. Honeywell, Inc., supra,* the district court was faced squarely with the issue of whether § 1125(a) encompasses claims other than those of the same general nature as trademark infringement. After noting a strain of ambiguity in *Samson Crane* regarding the substantive scope of § 1125, and the fact that such language was, in any event, superfluous to the court's decision, Judge Garrity concluded that palming off was not an essential element of a § 1125(a) claim. *Electronics Corp. of America v. Honeywell, Inc.,* 358 F.Supp. at 1233. On appeal, after stating that it "could not

A review of the history of the federal trademark legislation, however, leads to the conclusion that *Samson Crane's* narrow interpretation of § 1125(a) is erroneous, and should not be followed by this court. In a thorough opinion in *Skil Corporation v. Rockwell International Corporation,* the court set forth a plethora of ways in which § 43(a) of the Lanham Act modified its predecessor, the Trademark Act of 1920, 15 U.S.C. § 123:

> The older section dealt only with "a false designation of origin" affixed to "an article of merchandise"; it applied only against persons who used such designations "willfully and with intent to deceive"; and it gave an action only to persons "doing business in the locality falsely indicated as that of origin" or associations of such persons. Section 43(a) changed this by eliminating the requirement that the falsity be willful. Descriptions of both goods and services are now covered. A prohibition against any false description or representation of the goods or services themselves was added to the prohibition against false designations of origin. Lastly, the "standing" requirement of the statute was liberalized to include any person who believes he is or is likely to be damaged.

375 F.Supp. at 784.

While *Skil Corporation,* in reaching its result, looked at the changes wrought by the revamped legislation that court's *ratio decidendi* is bulwarked by a review of the contemporaneous remarks of the Congress. The seminal document is a report of the Senate Committee on Patents, S.Rep. No. 1333 (May 14, 1946), *reprinted in* 1946 U.S.Code Cong. & Ad.News at 1274 *et seq.*

(Report). The Report plainly indicates that the goals of the Lanham Act included, *inter alia,* a desire "to secure trade-mark owners in the goodwill which they have built up, and to protect the public from imposition by the use of counterfeit and imitated marks and *false trade descriptions." Id.* at 1276 (emphasis added). "Sound public policy" was viewed by the seventy-ninth Congress in the light of "prevent[ing] diversion of trade through misrepresentation, and the protection of the public against deception." *Id.* at 1277. The purport of the Act was equated with "protection against swindling," *id.* at 1275, and concern was voiced anent "misappropriation by pirates and cheats." *Id.* at 1274. The Committee remarked that "[t]he purpose of this bill is ... to make it stronger and more liberal, to dispense with mere technical prohibitions and arbitrary provisions, to make ... relief against infringement prompt and effective." *Id.* And, the Report stated:

> To protect trademarks, therefore, is to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not. This is the end to which this bill is directed.

*Id.* at 1275.

This is heady stuff; and it leaves scant room to doubt that the enacting Congress sought to expand the reach of national legislation so as to accomplish these ends. The Senate's emphasis on consumer protection was innovative at the time, and militates strongly in favor of an expansive

---

improve on the thoughtful opinion of the district court," the First Circuit affirmed the decision below on the basis of the district court's opinion. *Electronics Corp. of America v. Honeywell, Inc.,* 487 F.2d at 513. The court further stated:

> Our second comment is that in relying on the district court opinion, we do not indicate necessary agreement with its conclusion that palming off is not an essential element of a Lanham Act claim. We say this only because such a stance is not necessary for the decision of this appeal.

*Id.* at 514.

It cannot be gainsaid that this language, for purposes of the instant case, settles nothing. Nor has any later First Circuit decision ruled definitively on the issue. As the court in *Salomon/North America* correctly noted (484 F.Supp. at 849), *Quabaug Rubber Co. v. Fabiano Shoe Co., supra,* involved a traditional claim of palming off. And, in *Pignons S.A. de Mecanique v. Polaroid Corporation,* 657 F.2d at 493 n. 5, the Court of Appeals again expressly declined to rule on whether § 1125(a) encompasses a claim for mere false advertising.

reading of the statute. While this court is mindful that the Lanham Act is not to be interpreted to encompass every conceivable type of deceptive trade practice, *see Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 236–37 (2d Cir.1974), perscrutation of the legislation's history leads to the inexorable conclusion that § 1125(a) was meant to apply to a broader class of misrepresentations than *Samson Crane* suggests. As the Ninth Circuit has recently counselled after conducting its independent assessment of the relevant legislative history: "Unlike prior law, the Lanham Act is directed toward protecting the consumer as well as the competitor from false and deceptive advertising." *U-Haul International, Inc. v. Jartran, Inc.,* 681 F.2d at 1162. And, given the language of § 1125(a) itself, the case at bar ought not to be excluded from the prophylaxis of the Act.

■ Moreover, even assuming *arguendo* that *Samson Crane* is still good law as to the scope of § 1125(a), Lotito's deceptive misrepresentations would nevertheless be interdicted. The crux of the *Samson Crane* holding was to the effect that § 1125(a) did not inveigh against the entire spectrum of undesirable business practices which involve deception, but instead, extends to "only such false descriptions or representations as are of substantially the same economic nature as those which involve infringement or other improper use of trade-marks." 87 F.Supp. at 222. In *Samson Crane,* the deceitful practices involved no false description or representation of the goods themselves. *Id.* In contrast, the defendants' use of the AILU mark under the circumstances at bar directly implicated the invitations themselves, and perforce created the impression that they were produced by a shop employing members of a recognized labor organization. Moreover, unlike *Samson Crane,* the plaintiffs' proof in this case reveals

causes of action which this court (*see* Part V, *ante*) believes are sufficient to slip within the integument of § 1114. Even if one argues that, inasmuch as the GCIU's charges do not fit precisely into the mold for trademark infringement, the court's § 1114 holding is erroneous, nevertheless, the acts complained of are at the very least of "substantially the same economic nature" as an infringement claim. The GCIU is the owner of three registered trademarks. And its claim, like a palming off claim for trademark infringement, is at bottom a contention that the defendants' use of a similar mark is likely to cause confusion to the public. *See, e.g., Astra Pharmaceutical Products, Inc.,* 718 F.2d at 1204; *Pignons S.A. de Mecanique v. Polaroid Corporation,* 657 F.2d at 486–87.

■ Not only do the plaintiffs' allegations, viewed in this light, fall well within the ambit of § 1125(a), but also, there is ample evidence in the record to support plaintiffs' right to relief under that provision. The first requirement of § 1125(a) is that the descriptions or representations be false. It is beyond cavil that, in determining whether a representation is false and misleading, the statements and the presentation thereof must be surveyed in their entirety, including "not only what [was] said but also [that which was] reasonably implied." *American Home Products Corp. v. Johnson & Johnson,* 577 F.2d 160, 165 n. 11 (2d Cir.1978). *See also Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 277 (2d Cir.1981). There is not a shred of doubt but that even an ordinarily prudent purchaser [14] would likely have been euchred into believing that Arrow's products were printed by a shop employing members of a bona fide labor union. *Cf. Baker v. Master Printers Union of New Jersey,* 34 F.Supp. at 810. And, although neither actual confusion nor intent to mislead need be shown, such circumstances

---

**14.** This is the standard of care normally applied, *see e.g., DeCosta v. Columbia Broadcasting System, Inc.,* 520 F.2d at 513; *B.D. Communications Inc. v. Dial Media, Inc.,* 429 F.Supp. 1011, 1013–14 (S.D.N.Y.1977), and the court rejects defendants' suggestion that a higher canon is warrant-

ed here. There was absolutely no evidence that those who might request that a union bug be affixed on printed materials have any special skill or expertise in the purchase of such goods. *See* 2 McCarthy, *op. cit.,* § 23:29.

materially strengthen a § 1125(a) case. *See Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d at 561 (intent); *Midway Manufacturing Co. v. Dirkschneider*, 543 F.Supp. 466, 489 (D.Neb.1981) (actual confusion). In this litigation, the plaintiffs have demonstrated both. Despite Lotito's lame assertions to the contrary, it is evident to the court that the defendants' use of the AILU bug was a deliberate, calculated attempt to convey the impression that Arrow was affiliated with a trade union. It is similarly beyond serious question that the defendants have willfully concocted an intentionally deceitful scheme—the success of which is adequately evinced by their ensnarement, under false colors, of the business of the DiLuglio committee.

■ The final showing that must be made under § 1125(a) is that the complaining party is likely to be damaged by the defendants' artifice. To prove a likelihood of harm, a plaintiff must show a logical causal connection between the false representations and his own position. *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d at 190. The GCIU has sustained this burden. Its members produce printed matter of the same genre as turned out by Arrow, and do so in the same geographical area; thus, they compete with respect to a common pool of customers. It is, moreover, not disputed that the ability to attract certain kinds of business depends on a printer's license to claim union affiliation. And, to feather the shaft, the plaintiffs have demonstrated that the GCIU (in Providence, at least) enjoys the near-monopolistic position required of a complainant at common law. *See* note 11, *ante.* For the foregoing reasons, howsoever the *Samson Crane* holding is viewed, the court is constrained to find that the plaintiffs have succeeded on the merits of this claim and have demonstrated with sagittal accuracy a right to injunctive relief under § 43(a) of the Lanham Act.

## VII.

Given the court's findings of fact, much the same analysis is applicable to the common law unfair competition charge. It is, of course, the common law of Rhode Island which is controlling as to this aspect of the case. *See, e.g., Golden Door, Inc. v. Odisho*, 437 F.Supp. at 967 (applying California common law in deciding a pendent claim of unfair competition). At common law,

> [o]ne who diverts trade from a competitor by fraudulently representing that the goods which he markets have ingredients or qualities which in fact they do not have but which the goods of the competitor do have is liable to the competitor for the harm so caused.

RESTATEMENT OF TORTS § 761 (1939).

■ The same evidence which supports the plaintiffs' right to relief under § 1125(a) also suffices to make out the common law claim for false advertising.[15] Nearly a century ago, Rhode Island recognized that "although one may make and sell an unprotected article, he cannot simulate the ... product of another so as to trench upon the latter's rights or to mislead the public." *Armington v. Palmer*, 21 R.I. 109, 115, 42 A. 308 (1898). Even apart from palming off, the vending of products "readily susceptible ... to customer confusion or deception" constitutes unfair competition under state law. *Bostitch, Inc. v. King Fastener Co.*, 87 R.I. 274, 289, 140 A.2d 274, 282 (1958).

Indeed, that a false representation of union affiliation is actionable under Rhode Island law was specifically suggested by the Rhode Island Supreme Court in *Merlino v. Schmetz*, 66 R.I. 425, 429–30, 20 A.2d 266, 267–68 (1941). In that case, an officer of the Journeymen Barbers' International Union of America brought suit to enjoin a competing union from displaying its shop card in the windows of certain business establishments in Woonsocket. The plaintiff's claim was essentially one of palming

---

**15.** As noted earlier, by demonstrating that the GCIU is virtually the exclusive source of "union printing" in the area, the plaintiffs have shown actual injury proximately caused by the defendants.

off—that the exhibition of a card with features akin to the plaintiff's would trick the public into thinking that tonsorial services within were being rendered by members of the plaintiff union. The court rejected plaintiff's claim on the ground that the cards were sufficiently dissimilar to insure that the public was not likely to be misled. *Id.*, 20 A.2d at 267. The state supreme court observed, however, that there was no evidence that the defendant was anything but a bona fide labor union; and concluded, therefore, that granting the requested relief "would amount, in effect, to granting to the complainants an exclusive property right in the words union shop...." *Id.*, 20 A.2d at 268. The clear implication of the court's statement, taken in context, is that if the defendant's status as a labor union was a sham, redress would lie. The case at bar presents the reverse side of the *Merlino* coin. Here, Lotito's actions were contrived to obfuscate the situation and to hoodwink the general public into purchasing Arrow's goods when the public intended to buy printed materials produced under the auspices of organized labor. In leading consumers up the garden path in this fashion, without any legitimate claim of entitlement to use of a symbol signifying affiliation with the labor movement, defendants are guilty of unfair competition under the common law. *Merlino, supra; Yellow Cab Co. of Rhode Island v. Anastasi*, 46 R.I. 49, 52, 124 A. 735, 736 (1924). *Cf. George v. George F. Berkander, Inc.*, 92 R.I. 426, 429, 169 A.2d 370, 371 (1961). And, it is no defense that, as Lotito asserts, he was merely effectuating the will of his customers. *Bostitch, Inc.*, 140 A.2d at 281–82.

## VIII.

In fine, the plaintiffs have proven their case against the defendants and are entitled to relief on the two Lanham Act claims, i.e., 15 U.S.C. § 1114 (count I of the second amended complaint) and 15 U.S.C.

§ 1125(a) (count II thereof) with respect to the three marks in question. The plaintiffs are likewise entitled to redress as to the GAIU and LPIU marks based upon state trademark law, R.I.Gen.Laws § 6–2–11 (count IV of the second amended complaint) and for common law unfair competition (count III thereof). The claim for relief under the state's Deceptive Trade Practices Act, R.I.Gen.Laws §§ 6–13.1–1 *et seq.*, is denied and dismissed.

A permanent injunction shall issue restraining the defendants, jointly and severally, their respective officers, agents, servants and employees, and those persons in active participation or concert with the aforenamed, or any or all of them, from using or displaying the AILU mark or any other counterfeit or colorable imitation of any of the GCIU's within-mentioned marks, in the conduct of any printing business or similar or allied operation.[16]

The AILU "union label," and all slicks thereof, authorization cards appertaining thereto, and dies, plates, devices, molds, matrices or other paraphernalia used in the reproduction or embossing of the same, in the custody or control of the defendants, shall forthwith be delivered up by the persons enjoined to the plaintiffs for destruction; and all printed goods, advertising or promotional materials, signage and the like in the defendants' possession bearing the imprint of the bogus bug shall similarly be turned over and squashed. 15 U.S.C. § 1118. *See Amana Society v. Gemeinde Brau, Inc.*, 417 F.Supp. 310, 311 (N.D.Iowa 1976), *aff'd*, 557 F.2d 638 (8th Cir.) *cert. denied*, 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977); *Health Industries, Inc. v. European Health Spas*, 489 F.Supp. 860, 868–69 (D.S.D.1980).

The defendants shall file with the clerk of court (and serve upon the plaintiffs), within thirty days next following the date of entry of the below-described order, an

---

**16.** If, and to the extent that, any of the defendants hereafter become affiliated with a bona fide trade union under and by means of a legitimate collective bargaining agreement, the injunction should not be drawn so as to foreclose such defendant(s) at that time, from the lawful use of the mark or bug (if any) of such union.

affidavit setting forth in detail the manner and form in which the parties enjoined have effected compliance with the injunction. *See* 15 U.S.C. § 1116.

The parties may, within sixty days from the date of entry of such order, conduct such further discovery as any of them deems appropriate as to the previously-bifurcated issue of damages (including the prayers of the second amended complaint for an accounting, for disgorgement of profits, and for attorneys' fees).[17] Promptly following the expiration of the discovery period, the case will be assigned for trial as to these claims.

Counsel for the plaintiffs shall forthwith prepare and present for entry a form of injunction and order consonant herewith.

17. The court specifically abjures any holding at this time as to which (if any) classifications of money damages or of ancillary financial balm may be available to the plaintiffs.